In the
United States Court of Appeals
For the Seventh Circuit

Nos.  99-3195, 99-4064, 00-1066, 00-1371,
00-1430 & 00-1702

The Society of Lloyd's,

Plaintiff-Appellee,

v.

James Frederick Ashenden, et al.,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 98 C 5335, 99 C 2651--Harry D. Leinenweber, Judge.

Argued September 19, 2000--Decided November 27, 2000

 Before Posner, Manion, and Kanne, Circuit Judges.

 Posner, Circuit Judge.  These are diversity suits brought in the federal district court in Chicago by Lloyd's, a foreign corporation (see Haynsworth v. The Corporation, 121 F.3d 956, 958 (5th Cir. 1997)), against American members ("names") of insurance syndicates that Lloyd's manages. 28 U.S.C. sec. 1332(a)(2). Lloyd's wanted to use the Illinois Uniform Foreign Money-Judgments Recognition Act, 735 ILCS 5/12-618 to 626, to collect money judgments, each for several hundred thousand dollars, that it had obtained against the defendants in an English court after the names' repeated efforts in earlier litigation to knock out the forum-selection clause in their contracts with Lloyd's had failed. Bonny v. Society of Lloyd's, 3 F.3d 156 (7th Cir. 1993); Lipcon v. Underwriters at Lloyd's, 148 F.3d 1285 (11th Cir. 1998); Richards v. Lloyd's of London, 135 F.3d 1289 (9th Cir. 1998); Haynsworth v. The Corporation, supra; Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996); Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir. 1993). Pursuant to this strategy, Lloyd's filed the judgments in the district court and then issued "citations" pursuant to the Illinois procedure for executing a judgment. The filing of the judgments inaugurated this federal-court proceeding to collect them; and state law, in this case the Illinois citations statute, 735

ILCS 5/2-1402, supplies the procedure for executing a federal-court judgment. Fed. R. Civ. Pro. 69(a); Resolution Trust Corp. v. Ruggiero, 994 F.2d 1221, 1226 (7th Cir. 1993); 12 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure sec. 3012, p. 148 (1997). The statute allows the holder of a judgment to depose the judgment debtor respecting the existence, amount, and whereabouts of assets that can be seized to satisfy the judgment; to impose a lien on those assets; and to command the debtor to turn over to the judgment creditor as many of the seizable assets as may be necessary to satisfy the judgment. See Bank of Aspen v. Fox Cartage, Inc., 533 N.E.2d 1080, 1083 (Ill. 1989).

The defendants ignored the citations and instead asked the district court not to recognize the English judgments as being enforceable in Illinois. They argued that those judgments had denied them due process of law and therefore were not enforceable under the foreign money-judgments recognition act, which makes a judgment rendered by a court outside the United States unenforceable in Illinois if "the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law." 735 ILCS 5/12-621 (emphasis added); see also 5/12-620. The district court rejected the argument and granted summary judgment for Lloyd's, declaring the judgments enforceable and so the issuance of citations proper.

We have italicized the word that defeats the defendants' argument. The judgments about which they complain were rendered by the Queen's Bench Division of England's High Court, which corresponds to our federal district courts; they were affirmed by the Court of Appeal, which corresponds to the federal courts of appeals; and the Appellate Committee of the House of Lords, which corresponds to the U.S. Supreme Court, denied the defendants' petition for review. Any suggestion that this system of courts "does not provide impartial tribunals or procedures compatible with the requirements of due process of law" borders on the risible. "[T]he courts of England are fair and neutral forums." Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 958 (10th Cir. 1992); to same effect see Haynsworth v. The Corporation, supra, 121 F.3d at 967; Roby v. Corporation of Lloyd's, supra, 996 F.2d at 1363. The origins of our concept of due process of law are English, Dent v. West Virginia, 129 U.S. 114, 123 (1889); Hurtado v. California, 110 U.S. 516, 528-32 (1884); Coniston Corp. v. Village of Hoffman Estates, 844 F.2d 461, 465 (7th Cir 1988); Keith Jurow, "Untimely Thoughts: A Reconsideration of the Origins of Due

Process of Law," 19 Am. J. Legal Hist. 265 (1975), and the English courts, especially the Supreme Court of Judicature (composed of the High Court and the Court of Appeal) and the Appellate Committee of the House of Lords, the tribunals involved in the judgments challenged here, are highly regarded for impartiality, professionalism, and scrupulous regard for procedural rights. The English judicial "system . . . is the very fount from which our system developed; a system which has procedures and goals which closely parallel our own." In re Hashim, 213 F.3d 1169, 1172 (9th Cir. 2000), quoting Somportex Ltd. v. Philadelphia Chewing Gum Corp., 318 F. Supp. 161, 166 (E.D. Pa. 1970), aff'd, 453 F.2d 435 (3d Cir. 1971). "United States courts which have inherited major portions of their judicial traditions and procedure from the United Kingdom are hardly in a position to call the Queen's Bench a kangaroo court." British Midland Airways Ltd. v. International Travel, Inc., 497 F.2d 869, 871 (9th Cir. 1974).

Not that the English concept of fair procedure is identical to ours; but we cannot believe that the Illinois statute is intended to bar the enforcement of all judgments of any foreign legal system that does not conform its procedural doctrines to the latest twist and turn of our courts regarding, for example, the circumstances under which due process requires an opportunity for a hearing in advance of the deprivation of a substantive right rather than afterwards. See Hilton v. Guyot, 159 U.S. 113, 205 (1895); Ingersoll Milling Machine Co. v. Granger, 833 F.2d 680, 687-88 (7th Cir. 1987). It is a fair guess that no foreign nation has decided to incorporate our due process doctrines into its own procedural law; and so we interpret "due process" in the Illinois statute (which, remember, is a uniform act, not one intended to reflect the idiosyncratic jurisprudence of a particular state) to refer to a concept of fair procedure simple and basic enough to describe the judicial processes of civilized nations, our peers. The statute requires only that the foreign procedure be "compatible with the requirements of due process of law," and we have interpreted this to mean that the foreign procedures are "fundamentally fair" and do not offend against "basic fairness." Id. at 687-88; see also Hilton v Guyot, supra, 159 U.S. at 202-03; Wilson v. Marchington, 127 F.3d 805, 811 (9th Cir. 1997); Guinness PLC v. Ward, 955 F.2d 875, 900-01 (4th Cir. 1992); Banco Minero v. Ross, 172 S.W. 711, 714-15 (Tex. 1915).

We'll call this the "international concept of due process" to distinguish it from the complex concept that has emerged from American case law.

We note that it is even less demanding than the test the courts use to determine whether to enforce a foreign arbitral award under the New York Convention, 9 U.S.C. sec. 201 et seq., whose due process defense (that a party lacked "proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case," Article V(1) (b), 9 U.S.C. sec. 201) has been interpreted to mean the enforcing jurisdiction's concept of due process, albeit a rather minimal such concept. Iran Aircraft Industries v. Avco Corp., 980 F.2d 141, 145-46 (2d Cir. 1992); see also Generica Ltd. v. Pharmaceutical Basics, Inc., 125 F.3d 1123, 1129-31 (7th Cir. 1997).

It is true that no evidence was presented in the district court on whether England has a civilized legal system, but that is because the question is not open to doubt. We need not consider what kind of evidence would suffice to show that a foreign legal system "does not provide impartial tribunals or procedures compatible with the requirements of due process of law" if the challenged judgment had been rendered by Cuba, North Korea, Iran, Iraq, Congo, or some other nation whose adherence to the rule of law and commitment to the norm of due process are open to serious question, see, e.g., Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1411-12 (9th Cir. 1995); Choi v. Kim, 50 F.3d 244, 249-50 (3d Cir. 1995); Banco Minero v. Ross, supra, 172 S.W. at 715; Bridgeway Corp. v. Citibank, 45 F. Supp. 2d 276, 286-89 (S.D.N.Y. 1999), as England's are not. It is anyway not a question of fact. It is not, strictly speaking, a question of law either, but it is a question about the law of a foreign nation, and in answering such questions a federal court is not limited to the consideration of evidence that would be admissible under the Federal Rules of Evidence; any relevant material or source may be consulted. Fed. R. Civ. P. 44.1; Pittway Corp. v. United States, 88 F.3d 501, 504 (7th Cir. 1996); 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure sec. 2446 (1995).

Rather than trying to impugn the English legal system en gross, the defendants argue that the Illinois statute requires us to determine whether the particular judgments that they are challenging were issued in proceedings that conform to the requirements of due process of law as it has come to be understood in the case law of Illinois and other American jurisdictions. The statute, with its reference to "system," does not support such a retail approach, which would moreover be inconsistent with providing a streamlined, expeditious method for collecting money judgments rendered by courts in other

jurisdictions--which would in effect give the judgment creditor a further appeal on the merits. The process of collecting a judgment is not meant to require a second lawsuit, see Bank of Aspen v. Fox Cartage, Inc., supra, 533 N.E.2d at 1083; Resolution Trust Corp. v. Ruggiero, supra, 994 F.2d at 1226, thus converting every successful multinational suit for damages into two suits (actually three, as we'll see at the end of this opinion). But that is the implication of the defendants' argument. They claim to be free to object in the collection phase of the case to the procedures employed at the merits phase, even though they were free to challenge those procedures at that phase and indeed did so.

Even if the retail approach is valid--and we want to emphasize our belief that it is not--it cannot possibly avail the defendants here unless they are right that the approach requires subjecting the foreign proceeding to the specifics of the American doctrine of due process. They are not right. Just as no judgments of a foreign legal system would be enforceable in Illinois if the system had to conform to the specifics of the American doctrine of due process, so very few foreign judgments would be enforceable in Illinois if the proceeding in which such a judgment was rendered had to conform to those specifics. In a case decided by a foreign court system that has not adopted every jot and tittle of American due process (and no foreign court system has, to our knowledge, done that), it will be sheer accident that a particular proceeding happened to conform in every particular to our complex understanding of due process. So even the retail approach, in order to get within miles of being reasonable, would have to content itself with requiring foreign conformity to the international concept of due process.

And now let us for the sake of completeness apply that concept to the particulars of these judgments.

A bit of background (much simplified): Lloyd's, contrary to popular understanding, is not an insurer, but rather the overseer of the London insurance market. The actual insurance is written by syndicates of "names." The syndicates do not have limited liability, and so the personal assets of the names are at risk should an insured obtain a judgment for more than the assets of the syndicate that insured him. In the late 1980s and early 1990s the Lloyd's-supervised syndicates incurred huge underwriting losses that threatened to destroy the London insurance market. To ward off this disaster the governing body of Lloyd's, a Council elected primarily by the managing

agents of the syndicates, created a company called "Equitas" to reinsure the risks underwritten by the syndicates. The reinsurance would both protect the insureds against being unable to collect the proceeds of their insurance policies from the syndicates and protect the names from unlimited personal liability for the underwriting losses. To finance the new company, Lloyd's levied an assessment (the reinsurance premium) against all the names. Lloyd's offered a discount on the assessment to induce the names to go along with this plan voluntarily, and 95 percent of them did. The defendants are among those who did not, and Lloyd's sued them in the High Court to collect the assessment. The suit was based on the contract with Equitas, Lloyd's Council having (pursuant to a by-law that it had adopted) appointed "substitute agents" for all the names, and these agents having signed the contract on behalf of the defendants as of the other recusant names.

In the English court the defendants opposed Lloyd's suit on the basis of two clauses which they contend would, if enforced, deny them due process of law; and they renew the contention here. The first clause, the "pay now sue later" clause as the parties call it, forbids names, in suits (such as the ones before us) by Lloyd's to collect the assessment, to set off against the claim by Lloyd's any claim the names might have against Lloyd's, such as a claim that the contract had been induced by fraud. If they want to press such a claim they have to file a separate suit. (Some have now done so, and lost. Society of Lloyd's v. Jaffray, 2000 WL 1629463 (Queen's Bench Division Commercial Court Nov. 3, 2000).) The second clause, the "conclusive evidence" clause, makes Lloyd's determination of the amount of the assessment "conclusive" "in the absence of manifest error." The defendants claim that the High Court refused to order Lloyd's to provide them with enough information about how the assessment had been calculated to enable them to prove manifest error.

Both clauses therefore curtail the names' procedural rights. But due process is not a fixed menu of procedural rights. How much process is due depends on the circumstances. For the principle, see Gilbert v. Homar, 520 U.S. 924, 930-31 (1997), and Mathews v. Eldridge, 424 U.S. 319, 335 (1976), and for applications see, e.g., United States v. All Assets & Equipment of West Side Building Corp., 188 F.3d 440, 443-44 (7th Cir. 1999); Caldwell v. Miller, 790 F.2d 589, 608-09 (7th Cir. 1986); United States v. Any & All Radio Station Transmission Equipment, 218 F.3d 543, 550 (6th Cir. 2000). Faced with looming disaster, Lloyd's reasonably deemed it essential

to obtain adequate funding for Equitas. The only potential source for such funding consisted of the names themselves. If they were entitled to set off any claims they might have against Lloyd's, the collection of the full assessment would be deferred until those claims could be adjudicated. The pay now sue later clause was designed to enable Equitas to be fully funded immediately. That would work to the benefit of the names by giving them surer, earlier, and fuller reinsurance. In exchange it was reasonable to ask them to postpone the enforcement of any claims they might have against Lloyd's. Instead Lloyd's has had to prosecute these suits and many like them to collect from the names. Were it not for the pay now sue later clause, many other names might have forced Lloyd's into collection litigation as well.

In these circumstances the clause did not violate international due process or, we add unnecessarily, domestic due process. It is the same procedure used by federal law when a firm withdraws from a multiemployer pension plan--the firm is required to pay the plan administrator's assessment of the firm's share of vested but unfunded benefits and to reserve any objections for a subsequent suit, Multiemployer Pension Plan Amendments Act, 29 U.S.C. sec.sec. 1399(c)(2), 1401(d); Robbins v. Pepsi-Cola Metropolitan Bottling Co., 800 F.2d 641, 642 (7th Cir. 1986) (per curiam)--and this procedure ("pay now, dispute later," id.) has survived due process challenge, see, e.g., Debreceni v. Merchants Terminal Corp., 889 F.2d 1, 3-4 (1st Cir. 1989). Anyway the question is not whether Lloyd's accorded due process to the names, but whether the English courts did. All they did was enforce the clause, and they did so on the basis of an interpretation of a provision of the original contract between the names and Lloyd's that authorized Lloyd's to take measures unilaterally to prevent the society from failing. Stated differently, the courts held that the names had waived their procedural rights in advance, thus bringing the case within the rule of D.H. Overmyer Co. v. Frick Co., 405 U.S. 174 (1972). That case upheld against a due process challenge similar to that mounted by the names in this case the enforcement of a cognovit note, by which a debtor consents in advance to the creditor's obtaining a judgment against him on the note without notice or hearing, and possibly even--to make the analogy to the present case even closer--with the appearance on the debtor's behalf, to confess judgment, of an attorney designated by the creditor. Id. at 176. The English courts' interpretation of the original contract with the names as authorizing the pay now sue later clause could not be thought so unreasonable an interpretation of that contract as to take the

case out from under Overmyer by demonstrating the absence of a genuine waiver. And this is to assume that reasonableness in contract interpretation could ever be a component of due process, which we greatly doubt, as we're about to explain.

The rationale for the conclusive-evidence clause, and for the denial of full discovery regarding the accuracy of the assessment, is similar to the rationale for the pay now sue later clause. If the names could resist ponying up the assessment until its accuracy was determined by the normal process of litigation, with pretrial discovery followed by pretrial motions and by trial, the funding of Equitas would be delayed. But this clause does more than postpone claims by the names; it extinguishes them by shrinking the names' entitlement to a right to the rectification of only those errors that leap out from the assessment figure itself with no right to pretrial discovery to search out possible errors in the actuarial or other assumptions that generated the figure. This extinction of rights could raise a question if what we are calling international due process had a substantive component. But the defendants do not argue that it does. Though we cannot find a case on the point, the cases that deal with international due process talk only of procedural rights. See, e.g., Wilson v. Marchington, supra, 127 F.3d at 811. The only substantive basis that the Uniform Foreign Money-Judgments Recognition Act recognizes for not enforcing a foreign judgment is that "the cause of action on which the judgment is based is repugnant to the public policy" of Illinois, 735 ILCS 5/12-621; see, e.g., Ingersoll Milling Machine Co. v. Granger, supra, 833 F.2d at 686-88; cf. Loucks v. Standard Oil of New York, 120 N.E. 198, 201 (N.Y. 1918) (Cardozo, J.), a claim the plaintiffs have abandoned in this court.

If Parliament passed a law that the Equitas premium was whatever Lloyd's Council said it was, this would not be a denial of a procedural right of any of the names, but rather a revision of the substantive terms of the names' relation to Lloyd's. But if Parliament went further and precluded the names from challenging in court the applicability of the new law to them, that would be a curtailment of their procedural rights, and doubtless a deprivation of their property without due process of law. But this is not what happened. Lloyd's appointed agents to negotiate a contract binding the names that (they argue) was disadvantageous to them. It was disadvantageous in part because it reserved to Lloyd's a very broad discretion to fix the premium for the new reinsurance. But a one-sided contract is a

substantive, not a procedural, offense. (Nor, to recur for a moment to the pay now sue later clause, is an unreasonable contractual interpretation a procedural violation.) The names were free both to challenge the clause and to show if they could "manifest error" in the assessment of their liability under it. They could not show this, but only because manifest error is hard to prove. It would have to be an error that was obvious because of the disproportion between the reinsurance premium levied by Lloyd's and the risk to which the particular name would be exposed if he lacked reinsurance. Their real objection to the exclusive-evidence clause, moreover, is that it curtails pretrial discovery, and the right to pretrial discovery is not a part of the U.S. concept of due process, e.g., Midway Motor Lodge v. Innkeepers' Telemanagement & Equipment Corp., 54 F.3d 406, 408 (7th Cir. 1995); Silverman v. CFTC, 549 F.2d 28, 33 (7th Cir. 1977); Alexander v. Pathfinder, Inc., 189 F.3d 735, 741 (8th Cir. 1999), let alone of international due process. See, e.g., Hague Convention, art. 23 (reprinted at 28 U.S.C. sec. 1781); Panama Processes, S.A. v. Cities Service Co., 500 F. Supp. 787, 800 (S.D.N.Y. 1980), aff'd, 650 F.2d 408 (2d Cir. 1981); Rio Tinto Zinc Corp. v. Westinghouse, [1978] A.C. 547 (H.L.); Gary B. Born, International Civil Litigation in United States Courts 843-55 (1996).

And again the key question is not the fairness of Lloyd's measures but the fairness of the English court in holding that Lloyd's was authorized by its contract with the names to appoint agents to negotiate a contract that would bind the names without the names' consent. This interpretation of the original contract, like the interpretation authorizing Lloyd's to adopt the pay now sue later clause, is not so unreasonable that it could be thought a denial of international due process even if international due process had a substantive component.

We conclude that the judgments are enforceable under the foreign money-judgments statute, and we turn now to the other issues presented by these appeals. Several of the appellants were defendants in a separate suit brought by Lloyd's against dissenting names that was reassigned to the district judge (Judge Leinenweber) handling the other suits because it was identical to those suits. He granted judgment on the pleadings for Lloyd's in the separate suit. The defendants in that suit argue that the grant was erroneous, because Lloyd's had submitted evidence in support of the motion and Fed. R. Civ. P. 12(c) provides that when this is done the motion for judgment on the pleadings is automatically converted to a

motion for summary judgment and the defendants argue that, so reconceived, the motion should not have been granted until the defendants had a chance to put in their own evidence. The issue is moot. The suits are identical, and the defendants have not advised us of any evidence that would affect our determination that the judgments obtained by Lloyd's in England are enforceable under English law.

The separate appeal by Collins is frivolous and requires no discussion at all, and we proceed to the last issue, a challenge to the citations issued by Lloyd's in aid of its judgments. Since we are affirming the district court's order allowing Lloyd's to collect its judgments and hence to issue citations in aid of that collection effort, the challenge to the already issued citations may seem moot. But it is not, because Lloyd's may seek sanctions for contempt, the defendants having refused to comply with the citations. The issue of the validity of the sanctions could be deferred to the contempt proceeding, if any, but we think it best to try to wind up this litigation by resolving the issue now. It is not difficult to resolve. The defendants' argument is that in the case of a foreign judgment, as distinct from a judgment rendered by another jurisdiction within the United States, citations may not be issued until a court has entered an order recognizing (that is, declaring enforceable) the judgment that the citations are in aid of. We cannot see any legal or practical basis for such a two-step, and it is in tension with Ill. S. Ct. R. 277(a), which states that citation proceedings "may be commenced at any time with respect to a judgment which is subject to enforcement." Proceedings are "commenced" simply by an oral or written request to the clerk to issue citations. Ill. S. Ct. R. 277(b). The clerk does not investigate to see whether the judgment is truly enforceable. The issue of the judgment's enforceability is raised by way of defense to compliance with, not commencement of, the citations proceeding--which is what happened here. There is no reason to make the judgment creditor bring two separate proceedings, one to enforce the judgment and the other to collect it.

Any doubt on this score is dispelled by reading in tandem the statutes governing enforcement of foreign-state and foreign-nation judgments respectively. The Illinois Enforcement of Foreign Judgments Act, which governs the enforcement in Illinois of judgments rendered in the courts of other states of the United States, as distinct from foreign nations, not only treats such judgments the same as Illinois judgments, 735 ILCS 5/12-652(a), which means that no separate

step of "recognition" is necessary before they can be enforced; the act also makes the foreign judgment enforceable unless the judgment debtor objects and invokes "procedures, defenses, and proceedings for reopening, vacating, or staying" the judgment. This clearly implies that separate "recognition" proceedings are not required--an interpretation confirmed in cases from other jurisdictions that have adopted the Uniform Enforcement of Foreign Judgments Act. Redondo Construction Corp. v. United States, 157 F.3d 1060, 1065 (6th Cir. 1998); Burchett v. Roncari, 434 A.2d 941, 943 (Conn. 1980). The Uniform Enforcement of Foreign Money-Judgments Act, which governs judgments of courts outside the United States, makes such judgments, if enforceable at all, "enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit." 735 ILCS 5/12-620. Q.E.D.

Affirmed.