THE SOCIETY OF LLOYDS

v.

James Duncan WEBB.

No. CIV. A. 3 00 MC–042.

United States District Court,
N.D. Texas,
Dallas Division.

March 29, 2001.

---

Andrew M. Edison, Attorney at Law, C. Thomas Kruse, Attorney at Law, Bracewell & Patterson, Houston, TX, for Plaintiff.

Paul D. Flack, Attorney at Law, Clements, O'Neill, Pierce, Nickens & Wilson, Houston, TX, David B. Miller, Law Office of David B. Miller, Dallas, TX, Bradley W. Hoover, Hoover & Harger, Sugar Land, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Now before the Court are:

1. Defendant James Duncan Webb's Motion For Summary Judgment Denying Recognition of Foreign Judgment, filed on July 14, 2000, and brief in support;

2. The Society of Lloyds' Cross Motion for Summary Judgment in Support of Recognition of Foreign Judgment, filed September 6, 2000;

3. Defendant's Response to the Society of Lloyds' Cross Motion for Summary Judgment in Support of Recognition of Foreign Judgment, filed September 29, 2000, and brief in support;

4. The Society of Lloyds' Appendix, filed September 6, 2000;

5. The Society of Lloyds' Appendix Volumes 1–3, filed July 14, 2000;

6. The Society of Lloyds' Supplement of Legal Authority, filed December 4, 2000;

7. The Society of Lloyds' Supplement of Legal Authority, filed January 31, 2001.

Having considered the arguments and authorities presented, and the papers on file in the instant action, the Court is of the opinion that Defendant Webb's Motion for Summary Judgment is hereby DENIED and Plaintiff Lloyds' Cross Motion for Summary Judgment is hereby GRANTED.

## I. FACTUAL BACKGROUND

The facts, largely undisputed, are fairly detailed and involved.[1] James Duncan

---

1. For other discussions of the structure of Lloyds' of London and the facts behind these cases, *see The Society of Lloyd's v. Ashenden,* 233 F.3d 473 (7th Cir.2000), *Haynsworth v. The Corporation,* 121 F.3d 956, 958–961 (5th Cir.1997), *cert. denied,* 523 U.S. 1072, 118

Webb (hereinafter "Webb") is an American investor in the Society of LLoyds. The Society of LLoyds, also known as LLoyds of London, is a market made up of syndicates which offers insurance and reinsurance of risks. Its members are made up of: 1) insiders who engage in the daily business of insurance (such as brokers, underwriters, underwriting agents) and 2) "Names," who are outside investors, whose money provides the capital for LLoyds. By becoming a Name, a person accepts a certain amount of the premium paid for an insurance policy and is also assigned a correspondent *pro rata* share of the insurance risk. A Name's profit is derived from the amount of money, if any, remaining of the premium and earned investment income after the Name pays his *pro rata* share of expenses and claims. A Name pledges money to back the insurance policies issued by LLoyds syndicates and the Name's liability on that pledge is unlimited. Lloyds' underwriting agents, managers and underwriters represent the Names at LLoyds and make the management decisions, as the Names are prohibited from being involved in the actual business of LLoyds. If a person wishes to become a Name, he must execute a contract termed the "General Undertaking." Under this agreement, a Name agrees to abide with Lloyds' bylaws and controlling parliamentary acts.

A syndicate is a group of Names. Their pooled resources serve as reserves and permit LLoyds to underwrite risks and issue insurance policies. Each syndicate can specialize in a certain kind of insurance. The underwriting agent places a Name in a particular type of syndicate and each syndicate has a life of one year and stops accepting new business on December 31 of each year. The syndicate reinsures its risks by paying a premium to its newly-reconstituted self for the following year of account. This is called a Reinsurance To Closes ("RITC") and the syndicate manager calculates the amount of premium necessary to be paid to the newly reconstituted syndicate, which usually has a different group of Names. The calculation is made so that no profits or losses are allocated to outgoing or incoming Names. If a syndicate manager cannot quantify the risk, he cannot assess the RITC, then the year remains open and the Names remain liable for all claims that could not be quantified. A syndicate is said to be in run-off if it is unable to close.

The syndicate calculates RITC, profits and losses at the end of three years (even though it is a one year venture) because it takes three years for a claim to reach the stage where an underwriter can accurately calculate the RITC. Losses that are covered but not yet reported are called IBNR (Incurred But Not Reported) and these are the most difficult to calculate. Statistical projections and historical data predict IBNR. So, if a particular syndicate year is profitable, profits will not be paid to the Names until approximately three and a half years later when the syndicate's financial report is issued. In the meantime, all premiums are held in a trust fund, which the syndicate uses to pay claims and expenses.

Through the RITC, the members of the reinsuring syndicate agree to indemnify the members of the reinsured syndicate against all known and unknown liabilities arising out of business allocated to the closed year. If a year is closing with inaccurate numbers, the future Names will become liable for losses that should have

S.Ct. 1513, 140 L.Ed.2d 666 (1998) and *Allen v. Lloyd's of London,* 94 F.3d 923 (4th Cir. 1996).

been allocated to the past Names. Once a year is closed into a succeeding year, the RITC is final and LLoyds cannot correct past inaccuracies or inequities.

By the early 1980's LLoyds knew that it had problems with rising asbestos and toxic tort claims. The syndicates' reserves were inadequate to handle these rising claims and a committee known as the Asbestos Working Party was formed to gather information about the breadth of the problem. The problem was described as "the largest phenomenon that has ever hit the casualty insurance industry" and "the most significant legal and loss cost issue in the history of the industry." *See* Webb's Exhibit 9, Appendix 1 at Brief Exhibit 000905, 000920. Information about these claims was not published in the marketplace, was omitted from the audit instructions, and was not published in LLoyds financial statements for the year. Although a letter was prepared that provided the necessary disclosures to the Names, it was merely placed in a file and never distributed to the intended Names. Simultaneously, LLoyds was campaigning in Parliament for passage of the LLoyds Act of 1982 which granted LLoyds and its governing body extraordinary bylaw-making powers and immunity.[2] In exchange, LLoyds committed to providing better quality information to prospective Names. This promise was not fulfilled and LLoyds admitted to Parliament that it had not kept its promise. "The Council of LLoyds

very much regrets that the undertaking to implement the recommendations ... within 2 years of the Royal Assent has not been kept." *See* Webb's Exhibit 8, Appendix 1 at 000416. Webb began investing in LLoyds in 1983.

During the five years that LLoyds failed to improve information disseminated to prospective Names, approximately 10,000 new Names had joined LLoyds, most of whom were U.S. investors. For the years of account 1988 through 1992, LLoyds suffered losses in excess of £8 billion (these were reported in 1991–1995). Once the Names' inquiries into the cause for the losses began, they concluded that LLoyds had been guilty of serious negligence and/or fraud. According to Webb, no one informed him when he joined that he would be assigned risks greater than LLoyds had ever experienced before. According to Webb's declaration, LLoyds informed him that LLoyds had suffered a loss in only one of its 300 years and that LLoyds was a safe investment. *See* Webb's Exhibit 2, Appendix 1 at Brief App. 000004–000009.

The Names eventually filed suits in numerous cities across the United States claiming fraud against LLoyds in connection with their recruitment as investors, their placement on high-risk syndicates and their continuing to underwrite at LLoyds.[3] In each of the cases LLoyds moved to dismiss based on a forum selec-

---

**2.** The LLoyds Act of 1982 became law on July 23, 1982.

**3.** Some of these cases are as follows: *Lipcon v. Underwriters at Lloyd's*, 148 F.3d 1285 (11th Cir.1998), *cert. denied*, 525 U.S. 1093, 119 S.Ct. 851, 142 L.Ed.2d 704 (1999); *Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir.1998), *cert. denied*, 525 U.S. 943, 119 S.Ct. 365, 142 L.Ed.2d 301 (1998); *Haynsworth v. Lloyd's of London*, 121 F.3d 956 (5th Cir. 1997), *cert. denied*, 523 U.S. 1072, 118 S.Ct.

1513, 140 L.Ed.2d 666 (1998); *Allen v. Lloyd's of London*, 94 F.3d 923 (4th Cir.1996), *Bonny v. The Society of Lloyd's*, 3 F.3d 156 (7th Cir.1993), *cert. denied*, 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); *Roby v. Corporation of Lloyd's*, 996 F.2d 1353 (2d Cir.1993), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953 (10th Cir.1992), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992).

tion (the forum being in England) and choice of law (the law being English) clauses contained in the General Undertaking (*i.e.*, a contract) that the Names had signed. In each of the cases filed, the courts of appeals enforced the forum selection and choice of law clauses.

After trial in England, the English courts found Lloyds guilty of negligence with respect to their Names and awarded the Names damages totaling £1 billion. Pursuant to the Lloyds' Act of 1982, however, the Lloyds' Council enacted a by-law that caused the funds awarded to the Names to be frozen. The Lloyds' Council placed Lloyds as trustee of the trust funds. The appellate court of England upheld Lloyds' right to freeze the funds and appoint LLoyds as trustee under the LLoyds Act of 1982.

Because the losses were widely spread throughout the various syndicates, LLoyds developed a reorganization program in 1995–96 called Reconstruction and Renewal ("R & R"). This was a mandatory plan of reinsurance of all years of account prior to 1993 into one reinsurance company called Equitas Reinsurance Ltd. The available syndicate assets were £9.9 billion; yet the premium needed for the reinsurance (by December 31, 1995) was £14.7 billion. So, LLoyds put together a £3.2 billion package that included funds recovered in litigation, impounded, requisitioned from Names, from E & O insurers, brokers, underwriting agents, auditors, stop-loss recoveries, real estate sale, the Central Fund, assessments against Names, seizure of Names' deposits, and a credit facility. LLoyds set the Equitas premium of individual Names in a manner known only to it.

The Equitas premium was mandatory and each Name was required to pay Equitas the amount shown on his statement. If, however, the Name signed the settlement agreement included in the R & R package, the Name would be awarded a credit, which would result in a reduction in the amount he paid in. This credit was from the Names' litigation recoveries impounded by LLoyds and settlement proceeds attributable to the Names. To obtain the credit, the Name was required to grant LLoyds a release. However, the Names were not given a reciprocal release and were not provided indemnity. Furthermore, if Equitas were to fail, the Names were still required to provide the additional funds necessary until all liabilities for the old policies were paid. Finally, LLoyds disclaimed any responsibility for the accuracy of the statements in the settlement proposal and the Names were required to waive rescission or damages claims based on misrepresentations in the settlement proposal.

Some Names, one of whom is Webb, refused to accept the Equitas settlement. Consequently, LLoyds used its by-law powers from the LLoyds Act of 1982 to appoint a Substitute Agent. This Substitute Agent was instructed to sign the Equitas contract on behalf of the Names who refused to sign the Equitas settlement. Next, Lloyds began suing these non-settling Names. LLoyds paid Equitas the premium allegedly owed by the non-settling Names and received an assignment for the premium in exchange. It then sued the Names for the amount paid on their behalf.

LLoyds did serve a writ of summons on Webb, notifying him of the commencement of the English action against him. Although other Names actively defended the English litigation, Webb did not submit a notice of intention to defend nor did he contest Lloyds' claims. *See* Lloyds' Exhibit C, ¶ 11 at L0067.

The Names that did defend raised common objections and defenses; therefore,

the English Courts selected a "test" case to determine whether LLoyds was allowed to enforce the Equitas contract and collect the premiums. *See* Webb's Exhibit 3A at Brief Appendix 000023–000080. The "test" case resulted in a rejection of all the Names' fraud and non-fraud defenses. Specifically, the court found that the "pay now, sue later" clause was enforceable and the Names could not assert a fraud claim as a set-off to the Equitas premium due. *See id.; see also* Webb's Exhibit 3B at Brief App. 000128, 000130. The English court did find, however, that LLoyds *could* be sued for fraud damages and that the Names were free to pursue separate fraud claims against LLoyds. *See* Webb's Exhibit 3B at Brief App. 00121. As the court found, the "pay now, sue later" clause's "effect is and only is to insulate, as a matter of procedure, claims for the premium from counterclaims or set-offs asserted by the reinsured. It neither excludes nor necessarily postpones such cross-claims." *Id.*

The Equitas contract also contained a "conclusive evidence" clause, which meant that the amount of the premium was to be calculated by LLoyds, and its calculations of the premium was to be "conclusive evidence as between the Name and [Equitas], in the absence of manifest error." *See* Webb's Exhibit 21, Appendix 3 at Brief App. 001634. At the trial level, several hearings were held regarding the premium amounts and the trial court concluded that LLoyds produced sufficient documents justifying the premiums they claimed. *See* Lloyds' Exhibit C2 at L0084. Subsequently, each Name had the opportunity to present evidence that the calculation of the premium was "manifest error." The court ruled against the Names with respect to the "manifest error" claims. *See* Webb's Exhibit 3D at Brief App. 000220. The Names then sought leave to appeal, which was denied by the Court of Appeal. *See*

Lloyds' Exhibit C at Brief App. 000223–000226. Thus, the way was cleared for LLoyds to seek enforcement of its English judgments. At the conclusion of the foregoing proceedings, a default judgment was entered against Webb and in Lloyds' favor. *See* Lloyds' Exhibit C3 at L0091; Lloyds' Exhibit C, ¶ 19 at L0068. The default judgment entered against Webb and the enforcement of that judgment is the basis of the motions before this Court.

A fraud case against LLoyds was subsequently filed by over 200 Names titled *The Society of LLoyds v. Jaffray* (hereinafter *"Jaffray"*). The Names therein have raised fraudulent misrepresentation allegations, seeking extensive damages, including the return of the Equitas premium. *See* Lloyds' Exhibit C at L0069. The court in *Jaffray* issued an order requiring any Names wishing to bring a fraud claim against LLoyds to join the *Jaffray* action. Webb received notice of the order, yet failed to join. *See id.*

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must identify the evidence on file in the case which establishes the absence of any genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

Once the moving party has made an initial showing, the party opposing the motion must offer evidence sufficient to demonstrate the existence of the required elements of the party's case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment; the party defending against a motion for summary judgment cannot defeat the motion unless it provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in its favor. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

All evidence and the inferences to be drawn therefrom "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Marshall v. Victoria Transp. Co.*, 603 F.2d 1122, 1123 (5th Cir. 1979). However, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. Finally, in reviewing the summary judgment evidence, the Court has no duty to search the record for triable issues; rather, it need rely only on those portions of the submitted documents to which the nonmoving party directs its attention. *See Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

## III. *DISCUSSION*

This Court's jurisdiction is based on diversity of citizenship. Therefore, Texas law applies regarding the recognition of foreign judgments. *Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1003 (5th Cir.1990) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The Uniform Foreign Country Money–Judgment Recognition Act governs whether a judgment entered by a foreign nation will be recognized and enforced in Texas. Tex. Civ. Prac. & Rem.Code §§ 36.001–36.008 (Vernon 2000) (hereinafter the "Texas Recognition Act"). Under this Act, once a copy of the foreign judgment is filed with the clerk of the court in the county of residence of the party against whom recognition is sought, the party against whom recognition is sought may contest the judgment's recognition by filing a motion for non-recognition, which Webb has done. Tex. Civ. Prac. & Rem.Code §§ 36.0041, 36.0044. A court may refuse to enforce a foreign judgment if certain provision of § 36.005 of the Civil Practice and Remedies Code exist.

(a) A foreign country judgment is not conclusive if:

(1) the judgment was rendered under a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law;

(2) the foreign country court did not have personal jurisdiction over the defendant; or

(3) the foreign country court did not have jurisdiction over the subject matter.

(b) A foreign country judgment need not be recognized if:

(1) the defendant in the proceedings in the foreign country court did not re-

ceive notice of the proceedings in sufficient time to defend;

(2) the judgment was obtained by fraud;

(3) the cause of action on which the judgment is based is repugnant to the public policy of this state;

(4) the judgment conflicts with another final and conclusive judgment;

(5) the proceeding in the foreign country court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court;

(6) in the case of jurisdiction based only on personal service, the foreign country court was a seriously inconvenient forum for the trial of the action; or

(7) it is established that the foreign country in which the judgment was rendered does not recognize judgments rendered in this state that, but for the fact that they are rendered in this state, conform to the definition of "foreign country judgment."

Tex. Civ. Prac. & Rem.Code § 36.005.[4]

Webb challenges the judgment obtained against him on two grounds. First, he claims that it was obtained through procedures that deprived him of due process. Second, he claims that the judgment is repugnant to Texas public policy. *See* Webb's Motion for Summary Judgment Denying Recognition of Foreign Judgment at 23.

### A. Webb's Due Process Argument

Webb's due process arguments are primarily based on the "pay now, sue later" clause and the "conclusive evidence" clause. The "pay now, sue later" clause

forbids Names from obtaining a set-off of any claim the Names have against Lloyds when LLoyds is suing a Name to collect an assessment. So, for example, if a Name has a claim against LLoyds that he was induced by fraud, he may not raise it as a defense when LLoyds is collecting the assessment, but must bring the fraud claim in a separate suit, which must be separately filed. *See* Statement of Facts, *supra; see also The Society of Lloyd's v. Ashenden,* 233 F.3d 473, 478 (7th Cir.2000). Webb maintains that had the English court permitted the Names to prove their fraud claims in a counter-claim, LLoyds would not have a judgment against him or any other Name.

Webb asserts that this "conclusive evidence" clause cannot meet the due process requirement because it renders the amount of the assessment determined by LLoyds conclusive absent manifest error. The cumulative effect of both these clauses, Webb claims, is that Webb could not have a hearing, could not obtain discovery as to the amount of Lloyds' claim, and could not challenge Lloyds' calculation of the amount due, *i.e.,* that there was no pre-deprivation hearing.

### 1. The Foreign System Must Provide Due Process

■ The Texas Recognition Act states that a foreign country judgment will not be enforced in Texas "if judgment was rendered under a *system* that does not provide impartial tribunals or procedures compatible with the requirements of due process of law ...." Tex. Civ. Prac. & Rem.Code 36.005(a)(1) (emphasis added). Given the structure of the English system, which is substantially similar to our own,

---

4. The foreign judgment recognition statute is a uniform act, not one reflecting different rules of different states. *The Society of*

*Lloyd's v. Ashenden,* 233 F.3d 473, 476–77 (7th Cir.2000).

Webb's suggestion that the English court system does not provide tribunals compatible with due process in not tenable. *See Ashenden*, 233 F.3d at 475.[5]

The default judgment about which Webb complains was rendered by the Queen's Bench Division of England's High Court, which is the functional equivalent to America's Federal District Courts. The default judgment was not entered until the judgment in the "test" case was affirmed by England's court of appeals, which corresponds to America's courts of appeals, and the Appellate Committee of the House of Lords denied the petition for review. This court is the equivalent of America's United States Supreme Court. *See id.* at 476.

It is undisputed that the procedures used in the English courts were not identical to our own. However, American jurisprudence does not require that the procedures used in the courts of a foreign country be identical to those used in the courts of the United States. *Ingersoll Milling Machine Co. v. Granger*, 833 F.2d 680, 687 (7th Cir.1987). The issue is not whether the procedures used are similar or dissimilar to our procedure: "the issue is only the basic fairness of the foreign procedures." *Id.* at 688. The due process required in the foreign recognition judgment statutes simply requires the existence of a fair procedure "simple and basic enough to describe the judicial processes of civilized nations, our peers." *Ashenden*, 233 F.3d at 477. The statute requires only that the foreign procedure be "*compatible* with the requirements of due process of law and we have interpreted this to mean that the foreign procedures are fundamentally fair and do not offend against basic fairness." *Id.* (emphasis in original) (internal quotations and citations omitted). Specifically, it has

been held that the basic elements to establish a prima facie case that conclusive effect be given to a judgment obtained from a foreign country is that "the rendering court had jurisdiction over the person and subject matter, that there was timely notice and an opportunity to present a defense, that no fraud was involved, that the proceedings were according to a civilized jurisprudence are the same for both favored and nonfavored systems." *Hunt v. BP Exploration Co. (Libya) Ltd.*, 492 F.Supp. 885, 894 (N.D.Tex.1980).

The "basic fairness of the foreign procedures" being the litmus test, so to speak, this Court is hesitant to find that the procedures of the English system are basically unfair. As the *Hunt* case discussed, "the elements of the prima facie case are more likely to be met and it is less likely that such prima facie cases would be rebutted for judgments from favored systems." *Id.* at 894–95. The English system has long been considered a "favored system" by American courts. "In affording the English judgment the effect that we have, we are, of course, mindful that the system which rendered it is the very fount from which our system developed; a system which has procedures and goals which closely parallel our own. Surely, it could not be claimed that the English system is any other than one whose 'system of jurisprudence (is) likely to secure an impartial administration of justice between the citizens of its own country and those of other countries....'" *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 318 F.Supp. 161, 166 (E.D.Pa.1970), *aff'd*, 453 F.2d 435 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972) (*quoting Hilton v. Guyot*, 159 U.S. 113, 202, 16 S.Ct. 139, 40 L.Ed. 95 (1895)); *see also Haynsworth v. The Corporation*,

---

**5.** Although this Court is not bound by the Seventh Circuit's decision in *Ashenden*, it does find that decision to be well reasoned and applicable.

121 F.3d 956, 967 (5th Cir.1997) ("This is particularly so in the case of England, a forum that American courts repeatedly have recognized to be fair and impartial.). The Ninth circuit has also stated that "United States courts which have inherited major portions of their judicial traditions and procedure from the United Kingdom are hardly in a position to call the Queen's Bench a kangaroo court." *British Midland Airways Ltd. v. International Travel, Inc.*, 497 F.2d 869, 871 (9th Cir.1974).

The *Ashenden* court also addressed this issue and found that:

> Any suggestion that [the English] system of courts does not provide impartial tribunals or procedures compatible with the requirements of due process of law' borders on the risible. [T]he courts of England are fair and neutral forums. The origins of our concept of due process of law are English .... and the English courts ... are highly regarded for impartiality, professionalism, and scrupulous regard for procedural rights.

*Ashenden*, 233 F.3d at 476 (internal citations and quotations omitted).

The *Ashenden* court labeled the due process required from a foreign judgment the "international concept of due process." *Id.* This "international due process" is a less stringent due process than that required under American jurisprudence. Were we not to apply a less stringent approach to foreign judgments, a judgment rendered by a foreign court would never be enforced in the United States because it would fail to conform to "every jot and tittle" required from American due process. *Id.* at 478. Foreign judgments are to be afforded greater leniency when considering whether or not they complied with due process. *Id.*

Having established that "international due process" is a more flexible approach, this Court must now determine whether the "pay now, sue later" clause and the "conclusive evidence" clause limited Webb's procedural rights as they are defined under "international due process." It is important to remember, however, that "due process is not a fixed menu of procedural rights. How much process is due depends on the circumstances." *Id.* at 479.

LLoyds was faced with a potential disaster of having to pay numerous claims, thereby requiring it to immediately fund Equitas. The only source to fund these premiums was the Names. The Names were obligated to pay the assessment under the by-laws and the General Undertaking. Any set-off a Name might be entitled to could be litigated at a later date. The "pay now, sue later" and "conclusive evidence" clauses allowed LLoyds to immediately fund Equitas, yet did not preclude the Names from suing for fraud at a later date. *Id.* at 479–80. The *Ashenden* court found this process did not violate international due process and this Court agrees.

### 2. *Webb Waived His Procedural Rights*

■ This Court also finds, as did the *Ashenden* court, that even though the process afforded Webb complied with due process, Webb nevertheless waived his procedural rights in two ways. First, upon becoming a Name, Webb signed the General Undertaking. The English courts determined the "pay now, sue later" clause was enforceable based on Webb's signing the General Undertaking. Essentially, Webb, along with the other Names, waived his procedural rights in advance. Such a waiver of procedural rights is permitted under *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124

(1972); [6] *Ashenden,* 233 F.3d at 479. Interpreting the General Undertaking as authorizing LLoyds to enact the "pay now, sue later" clause is not an unreasonable interpretation such that Webb could argue the absence of waiver. *See Ashenden,* 233 F.3d at 479.

Similarly, the "conclusive evidence" clause did not violate due process. If the Names could avoid paying until the accuracy of the assessment was determined through litigation, the Equitas' funding would be delayed. *Id.* at 480. Yet, the conclusive evidence clause was even more onerous than the "pay now, sue later" clause because the only way the assessment could be challenged was if manifest error existed. Parliament, however, had passed a law stating that the Equitas premium was what the LLoyds Council determined it would be. "[T]his would not be a denial of a procedural right of any of the names, but rather a revision of the substantive terms of the names' relation to LLoyds." *Id.* LLoyds appointed an agent to negotiate the contract that bound the Names and this contract was disadvantageous to the Names because it reserved to LLoyds the discretion to fix the premium. However, this type of contract is not a procedural offense but a substantive offense. *Id.* Moreover, the argument that this clause precluded pretrial discovery is also insufficient since the right to discovery is not a part of the American concept of due process, nor international due process. *Id.* This Court agrees with the Seventh's Circuit's ultimate finding that the English court's interpretation of the original contract "is not so unreasonable that it could be thought a denial of international due process even if international due process had a substantive component." *Id.* at 480.

Webb also waived his procedural rights by failing to avail himself of the processes afforded him. The procedural safeguard were numerous: 1) the Names had notice of the English actions; 2) LLoyds served a writ of summons on Webb notifying him of the action; 3) Webb did not submit a notice of intention to defend nor did he contest LLoyds claims; 4) the English courts heard the Names' defenses to the enforcement of the Equitas contract before judgment—Webb failed to participate; 5) the Names had the opportunity to submit numerous affidavits and documents and were afforded time to argue their positions—Webb failed to participate; 6) Lloyds' claims involved numerous steps regarding implementation of the R & R and enforcement of the Equitas contract and the Names availed themselves of every defense to these claims—Webb failed to participate; 7) the Names appealed their claims to the court of appeals and to the Appellate Committee of the House of Lords—Webb failed to participate; 8) the English court gave Webb an opportunity to join the *Jaffray* action which raised fraud claims, among others, against LLoyds—Webb failed to join.

These numerous proceedings cannot be said to be lacking in due process. The Names had ample opportunities for hearings and appeals and lawsuits, yet Webb failed to participate in nary a one. Webb initially waived his rights in the General Undertaking, continued to waive his rights when he failed to avail himself of the due process afforded him and cannot now be heard to complain of it.

## B. *The Judgment Is Not Repugnant to Texas Public Policy*

Webb also claims that recognizing the foreign judgment would be repugnant to

---

**6.** The "Overmyer" rule is that "[t]he due process rights to notice and hearing prior to a civil judgment are subject to waiver." *Overmyer,* 405 U.S. at 185, 92 S.Ct. 775.

Texas public policy because it offends Texas public policy.

First, Webb explains that Texas prohibits cognovits and condemns judgments obtained through cognovits and enforces them only where a defendant "voluntarily, knowingly and intelligently" waived his rights. *See* Webb's Motion at 47 (quoting *Strick Lease, Inc. v. Cutler*, 759 S.W.2d 776, 777 (Tex.App.—El Paso 1988, no writ)). Second, Webb states that Lloyds' judgment is repugnant to Texas' public policy of protecting its citizens from fraud. Finally, Webb argues that the Texas Securities Act embodies a public policy to protect Texas investors and the contract on which Lloyds sued him violated the Texas Securities Act.

### 1. *Haynsworth Precludes Webb's Argument*

Webb agreed in the General Undertaking that English law, not Texas law, would govern any disputes between him and LLoyds. The Fifth Circuit has already upheld this choice of law and choice of forum clause and rejected the claim that English law would contravene the public policy of Texas. "The view that every foreign forum's remedies must duplicate those available under American law would render all forum selection clauses worthless...." *Haynsworth*, 121 F.3d at 969. The Fifth Circuit also found that in certain respects English law may even provide greater protections to a plaintiff for fraud in a securities transaction. *Id.* It is difficult to conceive how greater protections provided by the English system could possibly contravene Texas' public policy. The Fifth Circuit has not hesitated in forcing plaintiffs to litigate their securities claims in England.

### 2. *The Cause of Action Is Not Repugnant to Texas Public Policy*

A case similar to the issue before us had been addressed by the Fifth Circuit.

*Southwest Livestock v. Ramon* involved a judgment obtained on a note by Ramon, a Mexican company, in Mexico. The Mexican court ordered Southwest to pay the debt and to pay interest at 48 percent. *Southwest Livestock v. Ramon*, 169 F.3d 317, 319 (5th Cir.1999). Southwest filed a motion for summary judgment in a U.S. federal district court, claiming that Ramon charged usurious interest in violation of Texas law. *Id.* The magistrate judge, whose recommendation was adopted by the district judge, found that the Mexican judgment violated Texas public policy.

On appeal, the Fifth Circuit first stated that to deny a judgment based on a public policy argument, the "level of contravention of Texas law has to be high".... *Id.* at 321 (internal quotations and citations omitted). "The narrowness of the public policy exception reflects a compromise between two axioms—res judicata and fairness to litigants—that underlie our law of recognition of foreign country judgments." *Id.*

A court may refuse to recognize a foreign judgment if "the *cause of action* on which the judgment is based is repugnant to the public policy of this state." Tex. Civ. Prac. & Rem.Code 36.005(b)(3) (emphasis added). As the Fifth Circuit stated in *Southwest*, this requirement refers to the cause of action on which the judgment is based, not the judgment itself. "Thus, the fact that a judgment offends Texas public policy does not, in and of itself, permit the district court to refuse recognition of that judgment." *Southwest*, 169 F.3d at 321. The cause of action at issue in *Southwest* was the collection of a promissory note, which is not a cause of action repugnant to the public policy of Texas. *Id.* Under the Texas Recognition Act, even though the Mexican judgment was usuri-

ous, the cause of action that brought about the judgment was not against public policy. *Id.*[7]

■ The court in *Hunt* has also stated that courts will not deny recognition of a foreign judgment simply because the law of the foreign country differs from that of the forum. "The level of contravention would have to be high before recognition would be denied on public policy grounds." *Hunt*, 492 F.Supp. at 899. Another Texas case has held that "the mere fact that [various] aspects of the law differ from ours does not render them violative of public policy. Furthermore, there is nothing in the substance of these laws inimical to good morals, natural justice, or the general interests of the citizen of this state." *Gutierrez v. Collins*, 583 S.W.2d 312, 322 (Tex.1979). As another Texas court has succinctly stated:

> Enforcement of a judgment of a foreign court based on the law of the foreign jurisdiction does not offend the public policy of the forum simply because the body of foreign law upon which the judgment is based is different from the law of the forum or because the foreign law is more favorable to the judgment creditor than the law of the forum would have been had the original suit been brought at the forum. The very idea of a law of conflicts of law presupposes differences in the laws of various jurisdictions and that different initial results may be obtained depending upon whether one body of law is applied or another.

*Toronto–Dominion Bank v. Hall*, 367 F.Supp. 1009, 1016 (E.D.Ark.1973).

7. Similarly, the northern district of Texas has discussed this distinction in *Norkan Lodge Co. v. Gillum*, 587 F.Supp. 1457 (N.D.Tex.1984). *Gillum* asked the court to disregard a Canadian judgment based on the argument that it was contrary to public policy. Again, citing

### 3. *The Matter Is Within the Court's Discretion*

■ Whether or not to refuse to enforce a foreign judgment based on public policy grounds is within the discretion of this trial Court. Tex. Civ. Prac. & Rem.Code 36.005(b)(3). Webb agreed that England would be the forum should a dispute arise, Webb agreed to the application of English law, Webb agreed to be bound by Lloyds' regulatory authority. This Court will not interfere by refusing to recognize a judgment rendered by a favored system and, effectively, agreed to by Webb.

Webb also is not entitled to an evidentiary hearing on his fraud claim. By enforcing the forum selection clause, the Fifth Circuit has mandated that any such claims be brought in England. *See Haynsworth*, 121 F.3d 956. Finally, this Court denies Webb's request for a hearing to evaluate the damages assessed. Webb failed to challenge the damage calculations in England and the Court will not allow him to raise the challenge for the first time here.

### *CONCLUSION*

For the foregoing reasons, the Court finds that Webb has been afforded due process in the English courts. Even had Webb not be afforded due process, he waived his due process rights by signing the General Undertaking and by failing to participate in the available procedures. The judgment obtained against Webb is not contrary to the public policy of the State of Texas and Webb is not entitled to an evidentiary hearing regarding damages or fraud. Therefore, Webb's motion for summary judgment is hereby DENIED

the statute that requires the *cause of action* to be repugnant to public policy, the court stated that "the causes of action alleged, trespass and conversion, are not repugnant to Texas public policy." 587 F.Supp. at 1460.

and Lloyds' cross-motion for summary judgment is hereby GRANTED.

So Ordered.