# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

SOCIETY OF LLOYD'S,

      Plaintiff-Appellee,

v.

RICHARD A. REINHART,

      Defendant-Appellant.

No. 02-2301

SOCIETY OF LLOYD'S,

      Plaintiff-Appellee,

v.

GRANT R. CALDWELL, DAVID L.
GILLETTE, JAMES R. KRUSE,
EDWARD W. MUIR, and KENT B.
PETERSEN,

      Defendants-Appellants.

No. 03-4065

SOCIETY OF LLOYD'S

      Plaintiff-Appellee,

v.

STEPHEN M. HARMSEN; KELLY C.
HARMSEN,

      Defendants-Appellants.

No. 03-4082

SOCIETY OF LLOYD'S

      Plaintiff-Appellee,

v.

WALLACE R. BENNETT,

      Defendant-Appellant.

Nos. 03-4094, 03-4183 and 04-4142

**ORDER**

Filed May 6, 2005

Before **SEYMOUR**, **HENRY**, and **LUCERO**, Circuit Judges.

The opinion filed March 23, 2005, failed to include case number 04-4142, *Society of Lloyd's v. Bennett*. An amended opinion is attached hereto, adding that case number to the caption. This order shall stand as and for the amended mandate of the court.

Entered for the Court
PATRICK FISHER, Clerk of Court


by:
    Amy Frazier
    Deputy Clerk

-2-

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 23 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SOCIETY OF LLOYD'S,

        Plaintiff-Appellee,

    v.

RICHARD A. REINHART,

        Defendant-Appellant.

No. 02-2301

---

SOCIETY OF LLOYD'S,

        Plaintiff-Appellee,

v.

GRANT R. CALDWELL, DAVID L.
GILLETTE, JAMES R. KRUSE,
EDWARD W. MUIR, and KENT B.
PETERSEN,

        Defendants-Appellants.

No. 03-4065

---

SOCIETY OF LLOYD'S

        Plaintiff-Appellee,

v.

STEPHEN M. HARMSEN; KELLY C.
HARMSEN,

        Defendants-Appellants.

No. 03-4082

SOCIETY OF LLOYD'S

        Plaintiff-Appellee,

v.

WALLACE R. BENNETT,

        Defendant-Appellant.

Nos. 03-4094, 03-4183 and 04-4142

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICTS OF NEW MEXICO AND UTAH
(D.C. NOS. 02-264 LFG/WWD-ACE, 2:02-CV-204-TC)**

---

George R. McFall (Patrick J. Rogers, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico and Theodore W. Grippo, Jr., Lindenbaum Coffman Kurlander Brisky and Grippo, Ltd., Chicago, Illinois, with him on the briefs), Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico for Defendant-Appellant in Case Number 02-2301.

Barry D. Williams (Rikki L. Quintana with him on the brief) Krehbiel, Bannerman & Williams, P.A., Albuquerque, New Mexico, for Plaintiff-Appellee in Case Number 02-2301.

Matthew L. Lalli (Alan L. Sullivan and Troy L. Booher, Snell & Wilmer, L.L.P., Salt Lake City, Utah, and Theodore W. Grippo, Jr., Lindenbaum Coffman Kurlander Brisky and Grippo, Ltd., Chicago, Illinois, with him on the briefs) Snell & Wilmer, L.L.P., Salt Lake City, Utah, for Defendants-Appellants in Case Number 03-4065.

Steven A. Wuthrich, Montpelier, Idaho, for Defendants-Appellants in 03-4082.

Wallace R. Bennett, Defendant-Appellant, filed briefs pro se in Case Numbers 03-4094 and 03-4183.

-2-

Michael N. Zundel (James A. Boevers and Thomas R. Barton with him on the briefs) Prince, Yeates & Geldzahler, Salt Lake City, Utah, for Plaintiff-Appellee in 03-4065, 03-4082, 03-4094 and 03-4183.

---

Before **SEYMOUR** , **HENRY** , and **LUCERO,**  Circuit Judges.

---

**HENRY,**  Circuit Judge.

---

This consolidated appeal involves the Plaintiff-Appellee Lloyd's of London's request for the court's recognition and enforcement of money judgments issued by the High Court of Justice, Queen's Bench Division, London, England, in its favor against each of the defendants.  Lloyd's obtained money judgments in England against each of the six New Mexicans (the "New Mexico Names") and the nine Utahns (the "Utah Names") (collectively, the "Names") in connection with underwriting obligations.  Lloyd's then brought actions in the United States District Court for the Districts of New Mexico and Utah seeking recognition of these judgments as final and enforceable, entitled to full faith and credit in New Mexico and Utah, respectively.  Each federal district court granted summary judgment in favor of Lloyd's.  Of the Utah Names, one defendant reached a settlement with Lloyd's, leaving eight in this litigation.  Five of the six New Mexico Names reached settlements with Lloyd's.  We have consolidated these cases for disposition on appeal.

On appeal, the New Mexico Name raises several arguments. First, he argues that the English judgment deprived him of due process under New Mexico's Uniform Foreign Money-Judgment Recognition Act. Second, the New Mexico Name maintains that the English judgment stemmed from an action that is repugnant to New Mexico's public policy as the judgment: (a) violates New Mexico's securities laws; (b) is based on unconscionable contracts; (c) stems from adhesion contracts; (d) comprises unlawful cognovit notes, (e) is based on illusory contacts; and (f) violates the New Mexico Unfair Practices Act.

The Utah Names offer similar arguments. They contend that the district court cannot enforce the English judgments under Utah law, because the English system of jurisprudence is incompatible with American standards of due process, and that they did not receive an opportunity for a full and fair trial. The defendants also maintain that the English judgments conflict with Utah public policy. One Utah Name questions whether diversity jurisdiction exists, and also challenges the enforcement of the English judgments as violative of Utah securities laws. Two Utah Names also contend that the district court's approval of the English post-judgment interest of eight percent per annum was incorrect.

We hold that the Utah and New Mexico Names received due process under the English system of jurisprudence and that, in the thirty-two days of hearing before English trial and appellate courts, they received an opportunity for a full

and fair trial. As to the New Mexico Name, specifically, the English legal proceedings provided ample due process pursuant to New Mexico's Uniform Foreign Money-Judgment Recognition Act. We also hold that the Lloyd's judgments are not repugnant to New Mexico's public policy.

As to the Utah Names, we hold that the English proceedings satisfied Utah's due process requirements and the English judgments do not conflict with Utah's public policy. We also affirm the district court's denial of a motion for discovery and a motion to certify questions of law to the Utah Supreme Court. We hold that the parties in this case are diverse, and that enforcement of the English judgments does not violate Utah's securities laws. Finally, we reverse the district court's determination that Lloyd's English judgments should accrue interest at the English post-judgment interest rate.

## I. BACKGROUND

Numerous courts have summarized the basic facts applicable to the underlying litigation, and these facts are not in dispute. *See Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473 (7th Cir. 2000); *Haynsworth v. The Corp.*, 121 F.3d 956 (5th Cir. 1997); *Allen v. Lloyd's of London*, 94 F.3d 923 (4th Cir. 1996); *Soc'y of Lloyd's v. Webb*, 156 F. Supp. 2d 632 (N.D. Tex. 2001). We shall summarize

the pertinent facts here, borrowing heavily from the detailed and well-reasoned *Webb* decision.

Lloyd's is not an insurer, but rather is the regulator of an insurance market located in London. Through Parliamentary Acts, specifically the Lloyd's Acts of 1871-1982, Parliament created Lloyd's and authorized it to regulate the English insurance market. Individual and corporate members of Lloyd's known as "Names" underwrite insurance. The New Mexico defendants and Utah defendants became Names in the Lloyd's market between the late 1970's and late 1980's.

The Names underwrite insurance by forming groups known as syndicates. Names are passive investors in the sophisticated scheme, but along with potential profits they may incur substantial personal and direct liability with respect to a portion of a syndicate's risk in the Lloyd's market. The liability of each Name is several rather than joint. As a condition of becoming members of Lloyd's, Names enter into agreements governing their membership in Lloyd's and their underwriting in the Lloyd's market. At issue here is the General Undertaking Agreement, which obligated the New Mexico and Utah Names, and all other Names, to comply with the Parliamentary Acts under which Lloyd's was created and to submit any dispute arising out of their memberships or underwriting at Lloyd's to the English courts for resolution pursuant to English law. Each Name "irrevocably agree[d] that the courts of England [had] exclusive jurisdiction to

settle any dispute" arising out of the underwriting of insurance business, and agreed that such "[p]roceedings brought in the English courts [were] conclusive and binding upon any party and may be enforced in the courts of any other jurisdiction." Case No. 02-2301, Aplts' App. vol. I, at 43 (General Undertaking Agreement).

By the early 1980's, which is about the time that Lloyd's solicited the Utah and New Mexico Names,

> Lloyds knew that it had problems with rising asbestos and toxic tort claims. The syndicates' reserves were inadequate to handle these rising claims and a committee known as the Asbestos Working Party was formed to gather information about the breadth of the problem. The problem was described as "the largest phenomenon that has ever hit the casualty insurance industry" and "the most significant legal and loss cost issue in the history of the industry." *Information about these claims was not published in the marketplace, was omitted from the audit instructions, and was not published in Lloyds financial statements for the year* **.** Although a letter was prepared that provided the necessary disclosures to the Names, it was merely placed in a file and never distributed to the intended Names. Simultaneously, Lloyds was campaigning in Parliament for passage of the Lloyds Act of 1982 which granted Lloyds and its governing body extraordinary bylaw-making powers and immunity. In exchange, Lloyds committed to providing better quality information to prospective Names. This promise was not fulfilled and Lloyds admitted to Parliament that it had not kept its promise. "The Council of Lloyds very much regrets that the undertaking to implement the recommendations . . . within 2 years of the Royal Assent has not been kept."

*Webb*, 156 F. Supp. 2d at 635 (emphasis supplied) (internal citations omitted).

According to former Name and lead plaintiff in the fraud action against Lloyd's, Sir Peter Jaffray, "[t]he only way they could keep going was to suppress

-7-

the asbestos information, cook the books to ensure they were still showing profits and go after new investors." Case No. 02-2301, Aplts' App. vol. I, at 84 (Combined Mem. in Opp. to Summ. Judgment and in Support of Motion in Alt. for Discovery under Rule 56(c), Ex. 1 at 3 (*Lloyd's of London 1688 – ?,* TIME Feb. 21, 2002)). Further,

> [d]uring the five years that Lloyds failed to improve information disseminated to prospective Names, approximately 10,000 new Names had joined Lloyds, most of whom were U.S. investors.

*Webb*, 156 F. Supp. 2d at 635. The New Mexico and Utah Names contend that the Lloyd's representative emphasized Lloyd's long history of profitability, its exclusive and selective members, its program of annual audits, and that the risk of "unlimited liability" had been of little consequence in Lloyd's three-hundred-year history. *See* Case No. 02-2301, Aplts' App. vol. I, at 276-320 (Mem. in Opp. to Summ. Judgment, exs. 3 - 8 (Affids. from Utah Names)).

> For the years of account 1988 through 1992, Lloyds suffered losses in excess of £8 billion (these were reported in 1991-1995). Once the Names' inquiries into the cause for the losses began, they concluded that Lloyds had been guilty of serious negligence and/or fraud. . . .
>
> The Names eventually filed suits in numerous cities across the United States claiming fraud against Lloyds in connection with their recruitment as investors, their placement on high-risk syndicates and their continuing to underwrite at Lloyds. In each of the cases Lloyds moved to dismiss based on a forum selection (the forum being in England) and choice of law (the law being English) clauses contained in the General Undertaking (*i.e.*, a contract) that the Names had signed. In each of the cases filed, the courts of appeals enforced the forum selection and choice of law clauses.

*Webb*, 156 F. Supp. 2d at 635-36 (internal citations omitted).

Apparently, the New Mexico Name and several Utah Names were parties to one of these suits, *Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998). The *Richards* complaint indicates that all but Utah Names Stephen and Kelly Harmsen and were plaintiffs. *See* Case Nos. 03-4064, -4082, -4094, -4193, Aple's Supl. App. vol. I, doc. 3 at 43-49.

The *Richards* litigation addressed and rejected the Names' contention that "their disputes with Lloyd's should be litigated in the United States despite contract clauses binding the parties to proceed in England under English law." *Richards*, 135 F.3d at 1292. The Ninth Circuit held that to invalidate the choice of law provisions in the Lloyd's General Undertaking Agreement would result in an "unbounded" reach of the United States securities laws, and would hamper international commerce. *Id.* at 1293. Moreover, the court stated that "[t]he Names have recourse against [Lloyd's] for fraud, breach of fiduciary duty, or negligent misrepresentation." *Id.* at 1296. [1]

---

[1] To the extent that Lloyds raises res judicata and collateral estoppel as affirmative defenses with respect to Mr. Bennett's arguments against the enforcement of the choices of law and forum, these matters are addressed in *Richards*, as discussed in § II(C)(4)(b), *infra*, and we hold such claims are precluded. Although *Richards* also discussed the policies of the anti-waiver provisions of the federal securities laws and referenced various state securities laws, *Richards* was limited to the choices of law and forum proceedings. To the extent the Names challenge the choices of law and forum under the state

(continued...)

We reached a similar conclusion in *Riley v. Kingsley Underwriting*

*Agencies, Ltd.,* 969 F.2d 953, 958 (10th Cir. 1992).  We rejected the plaintiff

Name's contentions and held that

> English law does not preclude [the Name] from pursuing an action for
> fraud and we agree with the Defendants that the Lloyd's Act does not
> grant statutory immunity for such claims. We have been shown nothing
> to suggest that an English court would not be fair, and in fact, our
> courts have long recognized that the courts of England are fair and
> neutral forums.

*Id.* (internal citations omitted).     As such, trial proceeded in England.  Following

trial,

> the English courts found Lloyds guilty of negligence with respect to
> their Names and awarded the Names damages totaling £1 billion.
> Pursuant to the Lloyds' Act of 1982, however, the Lloyds' Council
> enacted a by-law that caused the funds awarded to the Names to be
> frozen. The Lloyds' Council placed Lloyds as trustee of the trust funds.
> The appellate court of England upheld Lloyds' right to freeze the funds
> and appoint Lloyds as trustee under the Lloyds Act of 1982.
>
> Because the losses were widely spread throughout the various
> syndicates, Lloyds developed a reorganization program in 1995-96
> called Reconstruction and Renewal ("R & R").  This was a mandatory
> plan of reinsurance of all years of account prior to 1993 into one
> reinsurance company called Equitas Reinsurance Ltd. The available
> syndicate assets were £9.9 billion; yet the premium needed for the
> reinsurance (by December 31, 1995) was £14.7 billion. . . .

*Webb*, 156 F. Supp. 2d at 636 (internal citations omitted).

---

[1](...continued)
securities laws, these too are precluded.  *See infra* § II(B)(2)(a).

In implementing the reorganization plan, Lloyd's required each Name to become a party to the Equitas reinsurance contract through an appointed, substituted agent, who signed the contract on behalf of the Name. The Equitas contract contained a "pay now, sue later" clause that precluded Names from asserting claims they might have against Lloyd's or others as a set-off or counterclaim to their Equitas Premium. The Equitas contract also contained a "conclusive evidence" clause, which provided that, in the absence of manifest error, Lloyd's determination of a Name's Equitas premium was conclusive:

> The Equitas premium was mandatory and each Name was required to pay Equitas the amount shown on his statement. If, however, the Name signed the settlement agreement included in the R & R package, the Name would be awarded a credit, which would result in a reduction in the amount he paid in.

*Id.*

The New Mexico and Utah Names were Names who neither signed the settlement agreement nor paid the assessment. When they did not pay, Lloyd's used its by-law powers from the Lloyd's Act of 1982 to appoint a Substitute Agent. This Substitute Agent was instructed to sign the Equitas contract on behalf of the Names who refused to sign the Equitas settlement. Next, Lloyd's began suing these non-settling Names. Lloyd's paid Equitas the premium allegedly owed by the non-settling Names and received an assignment for the premium in exchange. In late 1996, Lloyd's then sued the New Mexico and Utah

-11-

Names (and all remaining non-settling Names) for the amounts paid on their behalf.

Lloyd's served a writ of summons on each of the New Mexico and Utah Names, notifying them of the commencement of the English action against them. Each of the Names filed an Acknowledgment of Service of Writ of Summons through their solicitors of record. Through the filing of the Acknowledgment, each Name appeared in the English Court and notified Lloyd's of his or her intent to contest the claim. Although other Names actively defended in the English litigation, the New Mexico and Utah Names did not submit a notice of intention to defend, nor did they contest Lloyd's claims.

Those Names who did defend presented common objections and defenses. They alleged that Lloyd's lacked the regulatory authority to pursue certain aspects of the reorganization program, that they were entitled to rescind based on fraud in the inducement of their underwriting at Lloyd's, that they were entitled to litigate these claims of fraud, and that they were not bound by the Equitas reinsurance contract's "pay now, sue later" and "conclusive evidence" clauses. The English court found in favor of Lloyd's and entered judgment against each of the defendants. *See Webb*, 156 F. Supp. 2d at 636 (citing English cases).

Specifically, the court found that the "pay now, sue later" clause was enforceable and the Names could not assert a fraud claim as a set-off to the

Equitas premium due. At the trial level, several hearings were held regarding the premium amounts and the trial court concluded that Lloyd's produced sufficient documents justifying the premiums it claimed. Subsequently, each Name had the opportunity to present evidence that the calculation of the premium was "manifest error" pursuant to the Equitas contract. The court ruled against the Names with respect to the "manifest error" claims. *See Webb*, 156 F. Supp. 2d at 636.

The English court did find, however, that Lloyd's could be sued for fraud damages and that the Names were free to pursue separate fraud claims against Lloyd's. Approximately two-hundred non-settling Names brought a fraud case in England against Lloyd's titled *The Society of Lloyds v. Jaffray.* The Honorable Justice Cresswell of the High Court of Justice of England and Wales issued a 635-page decision in the *Jaffray* litigation in November 2000 dismissing sample Names' claims for deceit and fraudulent misrepresentation after a trial spanning nineteen weeks. *See* 2000 WL 1629463 (Q.B. 3 Nov. 3, 2000), *aff'd*, Ct. App. Civ. Div. 26 July 2002.

In October 1999, while the *Jaffray* case was pending, the court issued an order requiring any Names wishing to bring a fraud claim against Lloyd's to join the *Jaffray* action. Lloyd's sent a copy of a statement regarding the terms of the Order to every Name who had not accepted Lloyd's Reconstruction and Renewal settlement offer, including each of the New Mexico and Utah Names. *See* Case

No. 03-4002, vol. V, doc. 95 at 3. Neither the Utah Names nor the New Mexico

Name gave notice that they reserved the right to advance such allegations or

otherwise become parties to the *Jaffray* litigation.

The English judgments against the Names were affirmed on appeal. All

appeals from the entry of the English judgments have been exhausted. Following

these rulings, the English Court entered individual judgments in favor of Lloyd's

against each of the New Mexico and Utah Names.[2]  On March 8, 2002 Lloyd's

filed this action to collect on the judgments.


## II. DISCUSSION

The Names raise two overarching arguments regarding the errors of the

New Mexico and Utah district courts: (1) the courts erred when they determined

that the English proceedings provided due process to the Names; and (2) the

courts erred when they found that the English cause of action did not violate the

public policy of either New Mexico or Utah. They also challenge the district

---

[2]  As of March 7, 2002 the U.S. dollar amounts for the principal portions of the judgments were, in the aggregate, as follows:

Utah Names:        $1,757,549.31
New Mexico Name:  $   262,124.54

*See* Case Nos. 03-4065, -4082, -4094, -4183, Aple's Supl. App. vol. I, doc. 1, at 15-18 (Complaint filed Mar. 8, 2002); Case No. 02-2301, Aplts' App. vol. I, at 16 (Complaint filed Mar. 8, 2002).

courts' denial of other motions, and two Utah Names challenge the calculation of post-judgment interest.

At the outset, we note that the Names' two principal arguments have been raised unsuccessfully in various federal and state courts, by defendants from several states. [3] Although we affirm the grant of summary judgment to Lloyd's for largely the same reasons as our sister circuits, our analyses of the defenses brought by the New Mexico and Utah Names are slightly different because of the defenses the Names assert. Furthermore, Utah, unlike the states whose law was applied by each court that has addressed the issue, has not adopted the Uniform

---

[3] *See e.g.; Soc'y of Lloyd's v. Turner*, 303 F.3d 325 (5th Cir. 2002) (affirming summary judgment for Lloyd's, under Uniform Foreign Country Money-Judgment Recognition Act, on grounds that English courts provide due process and enforcement of English judgment is not repugnant to Texas public policy) ; *Ashenden*, 233 F.3d 473 (7th Cir. 2000) (affirming summary judgment for Lloyd's under Illinois Uniform Foreign Money-Judgment Recognition Act, explaining that existence of due process in English courts is a "question . . . not open to doubt") ; *Soc'y of Lloyd's v. Mullin,* 255 F. Supp. 2d 468, 476, 477 (E.D. Pa. 2003) (granting summary judgment for Lloyd's under Pennsylvania's Uniform Foreign Money Judgment Act, noting that "recognition of the English Judgment would not so offend Pennsylvania's notions of due process grounds," and that defendant's argument "fails to meet the high threshold for nonrecognition on public policy grounds"), *aff'd*, 96 Fed. Appx. 100 (3d Cir. May 5, 2004); *Soc'y of Lloyd's v. Grace* , 718 N.Y.S.2d 327, 328 (N.Y. App. Div. 2000) (affirming summary judgment for Lloyd's, explaining that "since the underlying English judgments are procedurally sound and do not violate any public policy of New York or the United States, they are entitled to comity"); *Soc'y of Lloyd's v. Baker,* 673 A.2d 1336, 1338 (Me. 1996) (affirming summary judgment for Lloyd's and stating that the "application [of doctrine of comity] is a question of law that may be resolved by the court on a motion for a summary judgment") (citations omitted).

Foreign Money-Judgment Recognition Act. Although the decisions of the other courts are highly persuasive, we must detour slightly as we apply Utah's comity analysis to the assertions of the Utah Names. Although we empathize with the losses that the New Mexico Name and Utah Names have incurred, and we appreciate the sincerity of their arguments, and we find many of Lloyd's acts to be distinctly distasteful, the agreements the Names signed and the applicable law require that we must affirm the thorough and well-reasoned orders of the district courts, with one slight exception.

**A. Standard of Review**

We review the district court's grant or denial of summary judgment de novo, applying the standard applied by the district court pursuant to Federal Rule of Civil Procedure 56(c). *Qwest Corp. v. City of Santa Fe, New Mexico,* 380 F.3d 1258, 1264 (10th Cir. 2004). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law.' We view the evidence in a light most favorable to the non-moving party." *Id.* (quoting FED. R. CIV. P. 56(c)).

**B. New Mexico Law**

The New Mexico Name contends that the district court erred when it failed to consider the procedures the English courts actually employed, and instead relied on the general proposition that the English courts are fair and neutral. The

New Mexico Name also asserts that the enforcement of the English judgments violates New Mexico public policy. Applying New Mexico law, we hold that the district court appropriately assessed the English judicial system and no violation of due process or New Mexico public policy occurred.

## 1. Due Process concerns were met.

The New Mexico Name claims the district court failed to appreciate how its enforcement of the English judgment deprived him of his due process rights. While the Full Faith and Credit Clause applies to the recognition and enforcement of judgments among sister states, it does not apply to judgments rendered in foreign countries. *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 322 n.4 (1981) (Stevens, J., concurring in the judgment) ("The Full Faith and Credit Clause, of course, was inapplicable . . . because the law of a foreign nation, rather than of a sister State, was at issue. . . ."). The parties cite no federal statute applicable to the enforcement of foreign court money judgments in U.S. courts, nor any applicable treaty. Instead, the recognition and enforcement of foreign judgments are governed by state law. *See Transport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 582 (2d Cir. 1993) ("We note that . . . the recognition of foreign judgments is governed by state law."); *see* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 481 cmt. a (1987).

-17-

New Mexico has adopted the Uniform Foreign Money-Judgment Recognition Act. *See* N.M. S TAT. ANN. §§ 39-4B-1 to 39-4B-9 (1978). Pursuant to the Act, "[a] foreign judgment is not conclusive" if

> the judgment was rendered under a *system* that does not provide impartial tribunals or procedures compatible with the requirements of due process of law;

and it "need not be recognized if:"

> (1) the defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;
> (2) the judgment was obtained by fraud;
> (3) the cause of action on which the judgment is based is repugnant to the public policy of this state . . . .

N. M. STAT. ANN. § 39-4B-5 (emphasis supplied).

The New Mexico Name contends that the New Mexico district court conflated the widely recognized general fairness of the English *system*, with this particular *judgment*, which, in his view, conflicts with his constitutional due process rights. Specifically, the New Mexico Name objects to (1) the English Courts' enforcement of the "pay-now, sue-later" clause, which prohibited him from raising certain defenses and counterclaims during the English action; (2) the "conclusive evidence" clause, because it renders the amount of the assessment determined by Lloyd's conclusive absent manifest error, and thereby fails to meet due process requirements; and (3) the fact that the cumulative effect of both these clauses is that the New Mexico Name could not receive a pre-deprivation hearing,

-18-

could not obtain discovery as to the amount of Lloyd's claim, and could not challenge Lloyd's calculation of the amount due.

As to whether the contested clauses, taken separately or together, amounted to a forfeit of the Name's due process rights, "[t]he question is not whether Lloyd's accorded due process to the names, but whether *the English courts* did. . . . Stated differently, the courts held that the names had waived their procedural rights in advance . . . ." *Ashenden*, 233 F.3d at 479 (emphasis supplied). Waiver of procedural rights in advance is clearly permitted, *see e.g., D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185 (1972) ("The due process rights to notice and hearing prior to a civil judgment are subject to waiver."). Moreover, given the New Mexico Name's "utter failure to participate in any stage of any of the English proceedings, 'we not only look with skepticism, but we flatly reject the due process complaint of a party who was given, and . . . waived, the opportunity of making the adequate presentation in the English Court.'" *Turner*, 303 F.3d at 331 n.20 (quoting *British Midland Airways Ltd. v. Int'l Travel Inc.*, 497 F.2d 869, 871 (9th Cir. 1974) (internal quotation marks omitted)).

Although the New Mexico Name would prefer to have us focus on this particular *judgment*, rather than the English *system*, at this stage of these matters, we are not permitted to do so. *See* N.M. STAT. ANN. § 39-4B-5 (indicating that to determine "conclusive[ness]" of a "foreign judgment," a court examines the

foreign country's "system" and whether it maintains "procedures compatible with the requirements of due process of law"). The procedures the English courts afford need not be identical to ours, they must only be compatible in that they do not offend the notion of basic fairness. *See Turner*, 303 F.3d at 331 ("the courts of England are fair and neutral forums") (footnoted citation omitted); *Hilton v. Guyot*, 159 U.S. 113, 205 (1895) ("[W]e are not prepared to hold that the fact that the [foreign] procedure . . . differed from that of our own courts is, of itself, a sufficient ground for impeaching the foreign judgment."); UNIFORM FOREIGN-MONEY JUDGMENTS RECOGNITION ACT § 4 cmt. ("[A] mere difference in the procedural system is not a sufficient basis for non-recognition. A case of serious injustice must be involved.");1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 482 cmt. b (1987) ("A court asked to recognize or enforce the judgment of a foreign court must satisfy itself of the essential fairness of the judicial system under which the judgment was rendered.").

And when we look to the basic fairness of the system, the answer is clear: "[O]ur courts have long recognized that the courts of England are fair and neutral forums." *Riley*, 969 F.2d at 958 (collecting cases); *see also Haynsworth,* 121 F.3d at 967 ("This is particularly so in the case of England, a forum that American courts repeatedly have recognized to be fair and impartial."). The

Seventh Circuit similarly lauded the English system's regard for due process in its highly persuasive opinion involving nearly identical claims:

> Any suggestion that [the English] system of courts does not provide impartial tribunals or procedures compatible with the requirements of due process of law borders on the risible. [T]he courts of England are fair and neutral forums. The origins of our concept of due process of law are English . . . . and the English courts . . . are highly regarded for impartiality, professionalism, and scrupulous regard for procedural rights.

*Ashenden*, 233 F.3d at 476 (internal citations and quotations omitted).

We agree with the Seventh Circuit's reasoning and hold that given the structure of the English system, which is substantially similar to our own, the New Mexico Name's suggestion that the English court system does not provide tribunals compatible with due process is untenable.        *See also Webb*, 156 F. Supp. 2d. at 640.

### 2. New Mexico's Public Policies were not violated.

The New Mexico Name also challenges the enforcement of the English judgments as a violation of New Mexico's public policy. First, he argues that Lloyd's violated the New Mexico Securities Act through its solicitation of unregistered securities and by making fraudulent representations. Second, he asserts that the Equitas contract is both procedurally and substantively unconscionable. Third, the New Mexico Name contends that the Equitas contract amounts to a contract of adhesion. Fourth, he asserts the Equitas contract is a

-21-

"cognovit note," which both violates New Mexico public policy and New Mexico law. Fifth, he maintains that the Equitas contract is illusory. Finally, he contends the New Mexico Unfair Practices Act bars recognition of the Equitas contract.

Even if we assume the shaky premises of these assertions to be true (that Lloyd's made material misrepresentations and those misrepresentations would allow rescission under New Mexico law), we reject each of these claims for one overriding reason: English law as applied here does not violate New Mexico's public policy. As we iterate throughout the opinion, "[t]he view that every foreign forum's remedies must duplicate those available under American law would render all forum selection clauses worthless. . . ." *Haynsworth*, 121 F.3d at 969; *see also Riley*, 969 F.2d at 958.

Furthermore, we reiterate that we must focus on the "cause of action" and the "claim for relief" underlying the English Judgment, not the differences in the bodies of law, because slight differences between England's and New Mexico's laws do not trigger the public policy exception. N.M. STAT. ANN § 39-4B-5(b)(3); *see Turner*, 303 F.3d at 332-33. Neither a breach of contract action nor a claim for money damages is repugnant to New Mexico public policy.

### a. The State Agreement trumps the New Mexico Securities Act.

The New Mexico Name emphasizes that the New Mexico Securities Act embodies a public policy to protect New Mexico, and New Mexicans, and that the

contract on which Lloyd's sued violated the state securities act. He relies heavily upon the declaration of Michael J. Vargon, Deputy Director of the Securities Division in the New Mexico Department of Regulation and Licensing. In an affidavit, Mr. Vargon states that after receiving various complaints from New Mexicans regarding Lloyd's solicitations to become Names, the Division concluded that the interest in the Names program was an investment contract and therefore a security, subject to the New Mexico Securities Act. Lloyd's failed to register these securities, and furthermore, "the information available to the Division strongly suggest[ed] fraud and misrepresentation in the inducement and continuing misrepresentation made to Names . . . ." Case No. 02-2301, Aplts' App. vol. I, at 325.

In response, Lloyd's points to the July 1996 State Agreement between Lloyd's and participating state securities regulators, including the Acting Director of the New Mexico Securities Division. The State Agreement recognizes that "certain State Securities Regulators have asserted the activities of Lloyd's . . . fall within the scope of their regulatory jurisdiction" and that "the activities of Lloyd's may have violated laws subject to their enforcement authority." *Id.* vol. II, at 747. The State Agreement also indicates that "Lloyd's denies it has violated any U.S. laws and denies it is subject to the jurisdiction of the States Securities Regulators with regard to the issues raised." *Id.*

The State Agreement appears to have been a necessary precursor to the enactment of the Reconstruction and Renewal plan. Under the State Agreement, Lloyd's promised to allocate credits to qualified State Names, in exchange for which the State Securities Regulators agreed to take steps necessary to terminate all proceedings and investigations pending against Lloyd's. In addition, the State Securities Regulators agreed not to "assist any private person or entity who seeks to pursue any action against Lloyd's . . . ." *Id.* vol. II, at 757. Because the Acting Director of the New Mexico Securities Division is a signatory to the State Agreement, and Mr. Vargon's declaration conflicts with the State Agreement, we reject the New Mexico Name's assertions based upon it. Furthermore, the New Mexico Name offers no explanation for this anomaly.

Moreover, as explained above, the New Mexico Name agreed in the General Undertaking Agreement that English law, not New Mexico law, would govern any disputes between Lloyd's and him. The choice of law and choice of forum clause are not at issue in this litigation, and to enforce the New Mexico securities laws in this context would be inappropriate. *See Riley,* 969 F.2d at 958 (approving forum selection clause of General Undertaking Agreement); *Richards*, 135 F.3d at 1292 (holding the same as to the majority of the defendant Names in this case).

**b. The English Judgments were not based on an unconscionable contract.**

Next, the New Mexico Name invites us to examine the underlying contractual dispute through his contention that the Equitas contract is both procedurally and substantively unconscionable under New Mexico law. Procedural unconscionability is determined "by examining the circumstances surrounding the contract formation, including the particular party's ability to understand the terms of the contact and the relative bargaining power of the parties." *Guthmann v. LaVida Llena,* 709 P.2d 675, 679 (N.M. 1985). "Factors to be considered include the use of sharp practices or high pressure tactics and the relative education, sophistication or wealth of the parties, as well as the relative scarcity of the subject matter of the contract." *Id.*

The New Mexico Name is a highly sophisticated investor who had to pass a "means" test and was required to post large sums of money as security for the unlimited liability that he knowingly undertook. Unquestionably Lloyd's presented no high pressure tactics: each Name was afforded the opportunity to read the General Undertaking Agreement in its entirety, and to fully understand the implications of its terms. *See id.* at 680. The Equitas contract was not a new investment decision; it was the implementation of specific provisions to address the unlimited liability undertaken by all Names, pursuant to the General

-25-

Undertaking Agreement's broad powers. There is no basis for concluding that there was any procedural unconscionability in the contracts on which the judgments were based.

The New Mexico Name's arguments regarding substantive unconscionability are equally unavailing. "Substantive unconscionability is concerned with contract terms that are illegal, contrary to public policy, or grossly unfair." *Id.* at 679. When terms are unreasonably favorable to one party a contract may be held to be substantively unconscionable. *Id.* at 680. "The terms are to be considered in the light of the general commercial background and the commercial needs of the particular trade or case." *Id.* (internal quotation marks omitted). Here, despite the apparently massive losses Lloyd's was absorbing, the terms of the General Undertaking Agreement were not so grossly unfair to the Names when the Agreement was formed. Approximately ninety-five percent of the Names accepted the subsequent Equitas contract, and forty-seven U.S. states signed the State Agreement to facilitate the Reconstruction and Renewal plan. Under these circumstances, we cannot say these were terms that "no man in his senses and not under delusion would make on the one hand, and . . . no honest and fair man would accept on the other." *Id.* (internal quotation marks omitted).

**c. The English Judgments were not based on an adhesion contract.**

-26-

The New Mexico Supreme Court's *Guthmann* holding also undergirds our rejection of the New Mexico Name's contention that the Equitas contract is an adhesion contract that violates New Mexico's public policy.

> Three elements must be satisfied before an adhesion contract may be found. First, the agreement must occur in the form of a standardized contract prepared or adopted by one party for the acceptance of the other. Second, the party proffering the standardized contract must enjoy a superior bargaining position because the weaker party virtually cannot avoid doing business under the particular contract terms. Finally, the contract must be offered to the weaker party on a take-it-or-leave-it basis, without opportunity for bargaining.

*Id.* at 678 (internal citations omitted). Here, the second and third elements are not met: the New Mexico Name was not in a weaker bargaining position nor did Lloyd's compel his investment.

**d. The English Judgments were not based on a "cognovit note."**

Next, the New Mexico Name contends that the General Undertaking Agreement and Equitas contract amount to a cognovit note, which is an ancient legal device "signed by a defendant in an action actually commenced confessing the plaintiff's demand to be just, and empowering the plaintiff to sign judgment against him in default of his paying the plaintiff the sum due to him within the time mentioned in the cognovit." BLACK'S LAW DICTIONARY (8th ed. 2004); *see Overmyer*, 405 U.S. at 176. Thus the debtor agrees in advance to the entry of a judgment against him without notice or hearing. New Mexico public policy and New Mexico law prohibit cognovits and condemn judgments obtained through

-27-

cognovits, enforcing them only where a defendant "voluntarily, knowingly and intelligently" waives his or her rights. As established above, the New Mexico Name did "voluntarily, knowingly and intelligently" waive his rights, in addition to receiving notice and being provided an opportunity to defend prior to the entry of the judgments. We have rejected the perceived lack of due process argument above, and consequently, this argument is foreclosed.

### e. The English Judgments were not based on illusory contracts.

Next, the New Mexico Name maintains that Lloyd's judgments are repugnant to New Mexico's public policy because they are based on illusory contracts. Specifically, he contends that the General Undertaking Agreement and the Equitas contract lack consideration. The General Undertaking Agreement was part of the overall investment agreement between the Names and Lloyd's. The Agreement certainly placed obligations upon Lloyd's: when underwriting or investment profits were made, Lloyd's had to distribute to each Name his or her proper share. Likewise, the Equitas contract was supported by consideration: this reinsurance contract helped Lloyd's survive and protected the Names from unlimited personal liability. The complaints about how Lloyd's may have met, or failed to meet, its obligations are another matter, which have also been considered by the English courts and in the *Jaffray* litigation.

### f. The New Mexico Unfair Practices Act does not apply.

-28-

Finally, the New Mexico Name contends that the enforcement of the English judgment violates New Mexico's public policy because the contracts violated the New Mexico Unfair Practice Act, N.M. Stat. Ann. § 57-12-1 *et seq.* The Unfair Practice Act defines an unconscionable trade practice as any act or practice in connection with the sale for offering for sale of any goods or services that takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree or results in a gross disparity between the value received by a person and the price paid. *See id.* § 57-12-2(E). Neither party addresses whether the New Mexico Unfair Practice Act encompasses an action involving the interests of the New Mexico Name in underwriting insurance. *See, e.g., Russell v. Dean Witter Reynolds, Inc.*, 510 A.2d 972, 977-78 (Conn. 1986) ("[Connecticut Unfair Trade Practice Act] does not apply to deceptive practices in the purchase and sale of securities" because "Connecticut has long separated regulation of the purchase and sale of securities from the regulation of unfair trade practices in other industries."); *Simpson v. Grimes,* 849 So. 2d 740, 745-746 (La. Ct. App. 2003) ("Although the plaintiffs allege unfair trade practices pursuant to [the Louisiana Unfair Trade Practices Act], this type of action under the . . . Unfair Trade Practices Act has been found inapplicable to cases involving securities.").

To the extent the New Mexico Name asserts that Lloyd's took unreasonable advantage of him through its misrepresentation regarding asbestos claims, the English courts have considered and rejected such claims. As above, we cannot allow the New Mexico Name to relitigate the underlying cause of action under New Mexico law, despite his attempt to frame the action as violating New Mexico public policy.

**C. Utah Law**

Turning to the defenses of the Utah Names, we hold that these defenses fail for similar reasons. The Utah Names first assert that the district court improperly analyzed Utah's principles of comity when it determined that the process underlying the English judgments comported with constitutional norms of due process and of Utah public policy. Specifically, the Utah Names contend they did not have a full and fair trial in England, because they were bound by unlawful contracts, prohibited from asserting affirmative defenses, and prohibited from discovering or presenting evidence to refute the existence of the amount of liability. Utah Names Stephen and Kelly Harmsen raise the related argument that Lloyd's made material misrepresentations when it induced them to become Names in the Lloyd's market by failing to disclose information about potential asbestos and toxic tort liability. As a result, neither the forum selection clause nor the

"pay-now, sue-later" clause should be held enforceable as matters of public policy.

The Utah Names also argue that they were entitled to discovery, and that the district court should have certified certain questions of law to the Utah Supreme Court. Utah Name Wallace Bennett contends that the district court lacked diversity jurisdiction, and that the enforcement of the judgment violates Utah's securities laws. Finally, Utah Names Stephen and Kelly Harmsen also challenge the district court's imposition of eight percent per annum post-judgment interest. With the exception of the post-judgment interest argument, we reject each of the Utah Names' contentions.

### 1. Principles of comity apply in this case.

Unlike New Mexico, Utah has not adopted the Uniform Foreign-Money Judgment Recognition Act. The Utah Supreme Court has indicated that a foreign country judgment can be enforced in Utah courts "under principles of comity." *Mori v. Mori*, 931 P.2d 854, 856 (Utah 1997) (citing *Hilton*, 159 U.S. 113). Under the Supreme Court's holding in *Hilton*, the principles of comity require recognition of a foreign judgment if

> (1) there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction,
> (2) conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant,
> (3) under a *system* of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries,

(4) there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or
(5) no other special reason exists indicating why the comity of this nation should not allow it full effect.

*Hilton*, 159 U.S. at 202 (emphasis added).

According to the Utah Names, and in seeming contrast to *Hilton*, Utah's comity requires an analysis of the fairness of the English *judgment*, not merely of the English judicial *system*. The judgment here was based upon the Utah Names' signing the General Undertaking, which is a standardized contract between Lloyd's and the individual Names. According to the Utah Names, their assent to the General Undertaking resulted in their unknowing waiver of future due process rights in the Equitas contract.

Utah law provides that questions regarding the validity of a foreign judgment "should be tested by the law of the jurisdiction where the judgment was rendered." *Rocky Mtn. Claim Staking v. Frandsen*, 884 P.2d 1299, 1300-01 (Utah. Ct. App. 1994). We have no choice under *Hilton* and *Rocky Mountain* but to examine the entirety of the foreign judicial *system*, and not the particularity of individual judgments. *See also* 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 482 cmt. b (1987) ("A court asked to recognize or enforce the judgment of a foreign court must satisfy itself of the essential fairness of the judicial system under which the judgment was rendered."). Like all the other circuits that have

-32-

examined the question, we have already determined that the English judicial system is procedurally above reproach. *See, e.g. Ashenden*, 233 F.3d at 478 ("Even if the [defendants'] approach is valid–and we want to emphasize our belief that it is not–it cannot possibly avail the defendants here unless they are right that the approach requires subjecting the foreign proceeding to the specifics of the American doctrine of due process."); *see also Hilton,* 159 U.S. at 205 ("[W]e are not prepared to hold that the fact that the [foreign] procedure . . . differed from that of our own courts is, of itself, a sufficient ground for impeaching the foreign judgment.").

Here, for the sake of completeness, the district court looked to the underlying decisions rendered by the English courts that have considered and rejected each of the Utah Names' challenges to the "pay-now, sue-later" and "conclusive evidence" clauses. Case No. 02-2301, Aple's Supl. App. at 230 (Utah Dist. Ct. Order filed Nov. 12, 2002). The "pay-now, sue-later" provision left the Names free to pursue claims of fraud against Lloyd's in a separate proceeding, which many Names pursued unsuccessfully in the *Jaffray* litigation. *See id.* (citing *Soc'y of Lloyd's v. Wilkinson & Others*, at 17, 21 (Q.B. 23 Apr. 1997), *aff'd, Soc'y of Lloyd's v. Lyon, Leighs & Wilkinson* (C.A. 31 July 1997) (Case Nos. 03-4065, -4082, -4094, -4183, Aple's Supl. App. vol. III, doc. 4, ex. J, at 682)).

The district court observed that the English courts held that the "conclusive evidence" clause was "not an unusual type of clause and [was] in principle appropriate to [the] contract." Case No. 02-2301, Aple's Supl. App. at 230 (quoting *Soc'y of Lloyd's v. Fraser & Others*, at 27 (C.A. 31 July 1998) (Case Nos. 03-4065, -4082, -4094, -4183, Aple's Supl. App. vol. III, doc. 4, ex. J, at 707)). Furthermore, the English courts "considered and rejected the argument that the Names should not be bound by the Equitas contract." Case No. 02-2301, Aple's Supl. App. at 230 (citing *Soc'y of Lloyd's v. Fitzgerald, Leigh and Others*, (Q.B. 20 Feb. 1997), *aff'd, Soc'y of Lloyd's v. Lyon, Leighs & Wilkinson* (C.A. 31 July 1997) (Case Nos. 03-4065, -4082, -4094, -4183, Aple's Supp, App. vol. III, doc. 4, ex. J, at 622)).

We must reject the Utah Names' contentions that they were bound by unlawful contracts, that they were prohibited from asserting affirmative defenses, and that they were prohibited from discovering or presenting evidence to refute the existence of amount or liability. We therefore agree with the district court that the Utah Names were given a full and fair opportunity to litigate their claims before the English courts.

Similarly, we must reject the defenses mounted by the Harmsens. The English court considered and rejected the allegations involving material

-34-

misrepresentations made by Lloyd's in connection with the solicitation of investment by potential Names.

**2. The District Court did not Abuse its Discretion when it Denied Discovery.**

The Utah Names sought discovery regarding (1) information about the basis for the amount of the alleged liability set forth in the English judgments; (2) information relating to Lloyd's appointment of the substitute agent and other details regarding the formation of the Equitas contract; and (3) information concerning Lloyd's contractual intent in entering into the General Undertaking Agreement.

Discovery rulings are generally within the sound discretion of the trial court, and we review only for abuse of discretion. *GWN Petroleum Corp. v. OK-Tex Oil & Gas, Inc.*, 998 F.2d 853, 858 (10th Cir. 1993). The discovery sought by the Utah Names was unnecessary to the district court's grant of summary judgment in favor of Lloyd's. To have granted the discovery would have resulted in a relitigation of the underlying General Undertaking Agreement and Equitas contract, both of which have been considered and litigated before the English courts. After reviewing the record, we find no abuse of discretion regarding the rulings on these motions.

**3. Certification of Questions of State Law**

The Utah Names suggest that (1) the district court erred when it refused to certify certain questions to the Utah Supreme Court and (2) we should sua sponte certify the questions of whether the English court met the "open courts provision" of the Utah Constitution. We reject each contention and hold that the district court did not abuse its discretion.

**a. District court's denial of the motion was not an abuse of discretion.**

We review the district court's decision not to certify questions of state law for abuse of discretion. *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988). Utah's open courts provision requires:

> All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

UTAH CONST. art. I, § 11.

In general, open courts provisions in Utah serve two principal purposes: "First, they were intended to help establish an independent foundation for the judiciary as an institution . . . . Second, open courts or remedies clauses were intended to grant individuals rights to a judicial remedy . . . ." *Laney v. Fairview City*, 57 P.3d 1007, 1016 (Utah 2002). The Names attempt to invoke the open

-36-

courts provisions in connection with their alleged waiver of their at the time-unknown due process rights.

While certification is appropriate "where the legal question at issue is novel and the applicable state law is unsettled," *Allstate Ins. Co. v. Brown*, 920 F.2d 664, 667 (10th Cir. 1990), it is never compelled. *See Lehman Bros. v. Schein*, 416 U.S. 386, 390-91 (1974). "[U]nder the diversity statutes the federal courts have the duty to decide questions of state law even if difficult or uncertain." *Copier v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998) (citing *Meredith v. Winter Haven*, 320 U.S. 228, 235 (1943)). There is little caselaw suggesting that English law or any foreign law somehow abrogates the Utah Constitution. We have established there is no due process violation and that the Names waived their procedural rights in advance. *See Overmyer,* 405 U.S. at 185. The district court did not abuse its discretion when it rejected the Utah Names' motion to certify.

### b. Sua sponte certification is unnecessary here.

We next consider whether we should certify this question to the Utah Supreme Court directly. Utah Rule of Appellate Procedure 41(a) states:

> The Utah Supreme Court may answer a question of Utah law certified to it by a court of the United States when requested to do so by such certifying court acting in accordance with the provisions of this rule if the state of the law of Utah applicable to a proceeding before the certifying court is uncertain.

Thus, there is a procedural mechanism for certification to the state court that we may consider using. However, we note that a necessary but not controlling component is the difficulty in determining the local law. *Cf. Lehman Bros.*, 416 U.S. 390 ("[T]he mere difficulty in ascertaining local law is no excuse for remitting the parties to a state tribunal for the start of another lawsuit."). *Lehman Brothers* further noted that "[w]e do not suggest that where there is doubt as to local law and where the certification procedure is available, resort to it is obligatory." *Id*. at 390-91.

While no Utah court has rendered a decision on the precise issue in question, our analysis above establishes that there is no unusual difficulty in deciding the state law question or a likelihood that Lloyd's theory of liability would be adopted by the Utah courts. Thus, given the above conclusions, certification is unnecessary.

**4. Outstanding Issues Presented by Utah Name Mr. Bennett**

Mr. Bennett maintains there is not complete diversity between the parties, and he challenges the district court's enforcement of the English judgments as a violation of Utah securities law. He also raises defenses we have previously rejected. We address each defense briefly.

### a. Diversity jurisdiction is present.

Mr. Bennett contends that Lloyd's is not a corporation, but is rather more like an association, which adopts the citizenship of each of its syndicate investment members. "Lloyd's and Equitas are merely agents for the syndicates, collecting cash calls from syndicate investor Names to pay off the liabilities arising from syndicate insurance policies." Bennett Rep. Br. at 5. Under this interpretation, "Lloyd's attempt to claim federal diversity jurisdiction is a sham" and there is no federal subject matter jurisdiction. *Id.*

We must reject Mr. Bennett's assertions. Early on, Lloyd's may have been a form of an unincorporated association, but under the Lloyd's Act of 1871, the company was incorporated. Although we agree that Lloyd's is not a corporation within the traditional sense of the word, *see Ashenden v. Lloyd's of London*, 934 F. Supp. 992, 998-99 (N.D. Ill.1996), there is no challenge to or question regarding Lloyd's place of incorporation (it is duly incorporated under the laws of England). Similarly it maintains its principal place of business in London, England. These facts are unchallenged, and comprise the weightiest part of our inquiry. *See id.* (noting that the most important consideration is Supreme Court precedent "indicating that the citizenship of business entities must be determined by the simple fact of legal incorporation or the lack thereof, rather than the nature or attributes of the entity in question."). We thus hold that the jurisdiction is

proper pursuant to 28 U.S.C. § 1332(a)(2). Equitas Reinsurance, Limited (the assignor of Lloyd's underlying claims against the Names) is also a duly incorporated English company formed under the laws of England, and Mr. Bennett's similar allegations against Equitas must also fail.

### b. The Utah Securities Act offers Mr. Bennett no relief.

Mr. Bennett points to the Utah Securities Acts' "anti-waiver" provision as a bar to the enforcement of the English judgments. The anti-waiver provision declares that "a condition, stipulation or provision binding a person acquiring a security to waive compliance with the chapter or rule hereunder is void." UTAH CODE ANN. § 61-22(9).

We note that the anti-waiver provisions of the Securities Acts of 1933 and 1934 are substantially the same as those found in the Utah statute. *See* 15 U.S.C. § 77n (1982) ("Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."); 15 U.S.C. § 78cc(a) (1982) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.").

The district court determined that our holding in *Riley* precluded enforcement of state as well as federal securities statutes. *See Riley*, 969 F.2d at

956. In *Riley*, the plaintiff claimed that Lloyd's engaged in the offer and sale of unregistered securities and made untrue statements of material fact and material omissions in connection with the sale of securities, violating both federal and Colorado's state securities laws. By enforcing the General Undertaking Agreement's forum selection clause requiring the application of English law, we did not deprive Mr. Riley of his day in court, but rather instructed Mr. Riley to "structure his case differently than if proceeding in federal district court." *Id.* at 958. Thus, we cannot accept Mr. Bennett's contentions and note that, as in the Ninth Circuit's decision in *Richards* (litigation to which Mr. Bennett was a party), "[w]e disagree with the dramatic assertion that the available English remedies are not adequate substitutes for the firm shields and finely honed swords provided by American securities law." *Richards*, 135 F.3d at 1296.

### c. Mr. Bennett's remaining defenses are unavailing.

Mr. Bennett's remaining claims duplicate the Utah Names' arguments, or are without merit. For example, he challenges whether the General Undertaking Agreement can be binding upon him. He suggests that Lloyd's engaged in breaches of fiduciary duty, concealment and material misrepresentations because the General Undertaking does not warn a committing investor that he or she might later be made subject to an entirely different undertaking. Mr. Bennett also

contends that the district court erred in its application of *Hilton*. For the reasons given above, we reject all of Mr. Bennett's defenses.

**5. Post-Judgment Interest**

Finally, Utah Names Stephen and Kelly Harmsen challenge the district court's application of an eight percent per annum post-judgment interest rate. They argue that once the federal district court enforced the judgments, the then-applicable interest rate of 1.16% was applicable.

We review de novo the district court's interpretation and application of 28 U.S.C. § 1961. *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1207 (10th Cir. 2004).

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding.

28 U.S.C. § 1961(a). "This section shall not be construed to affect the interest on any judgment of any court not specified in this section." *Id.* § 1961(c)(4).

The district court reasoned that the English court is not a court specified by § 1961, and because the Names agreed that English law would govern the litigation, the post-judgment interest rate should be determined by English law, which would be 8%. Lloyd's argues that because the Names agreed to be bound by English law, English post-judgment interest applies. Furthermore, Lloyd's

rejects the Harmsens' suggestion that the English judgments merge into the U.S. judgments.

We disagree with such reasoning. First, we acknowledge that parties may contract to, and agree upon, a post-judgment interest at a rate other than that specified in § 1961. *See Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 101 (2d Cir. 2004) ("We agree that parties may by contract set a post-judgment rate at which interest shall be payable."). However, agreeing to be bound by English law does not amount to agreeing to a particular post-judgment interest rate. The general rule under federal and Utah law is that "when a valid and final judgment for the payment of money is rendered, the original claim is extinguished, and a new cause of action on the judgment is substituted for it. In such a case, the original claim loses its character and identity and is merged in the judgment." *See Carte Blanche (Singapore) PTE., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 269 (2d Cir. 1989); *Yergensen v. Ford*, 402 P.2d 696, 697 (Utah 1965). "If parties want to override the general rule on merger and specify a post-judgment interest rate, they must express such intent through clear, unambiguous and unequivocal language." *Westinghouse Credit Corp.*, 371 F.3d at 102 (internal quotation omitted). Such language is not present in the agreements before us.

Second, the policies behind § 1961(a) support the application of the U.S. interest rate. "The purpose of postjudgment interest is to compensate the

successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the [judgment] and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) (quotations and alterations omitted). It preserves the value of the award as originally decided, affording neither party a benefit.

> [T]he universal application of Section 1961 to all types of claims makes for logical uniformity. Once a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises. *See* RESTATEMENT OF JUDGMENTS § 47 (1942). A single rule should govern interest on any such debt, the nature of the original claim having become irrelevant under the doctrine of merger.

*Kotsopoulos v. Asturia Shipping Co., S.A.*, 467 F.2d 91, 95 (2d Cir. 1972).

Thus, the federal rate reflects the economic conditions at the time the district court rendered its judgment, and, despite the disparity between the rates, we must apply § 1961(a), so interest accrues under the federal rate from the time the federal district court entered an order enforcing the judgment. *See Carte Blanche,* 888 F.2d at 268 (noting the provisions of § 1961(a) are mandatory).

We note that the application of § 1961 also fosters stability and certainty in international commercial transactions. Moreover, it provides "make whole" relief without overcompensating Lloyd's. Lloyd's derives various benefits from utilizing the federal court system to procure the execution and enforcement of its

judgments. In return, Lloyd's is subject to the federal formula for determining an equitable post-judgment interest.

Finally, as to the district court's concerns with the limitations provided in § 1961(c)(4), we agree that the U.S. post-judgment interest rate applies to the district court's judgments, but not to the English court's judgments. The U.S. post-judgment rate should apply as of the date of the entry of the judgment in the U.S. district court.

Here, the eight percent figure appears to have been calculated in 1993, five years before the entry of the English judgment. *See* Case Nos. 03-4065, -4082, -4064, -4183, Aple's Supl. App. vol. IV, at 995-96 (Section 17 of the Judgments Act of 1838 as amended by Statutory Instrument 1993 564 (L.2) and provision of the Civil Procedure Rule 1998). The federal rate is calculated on a more current weekly basis, and better reflects the value of the award once entered in the United States.

Therefore, on remand, we instruct the Utah district court to clarify that the English post-judgment rate applies to the Harmsens' judgments from the entry of the English judgment (March 11, 1998) until the entry of the U.S. judgment enforcing the English judgment (November 2002) and that the federal rate, calculated pursuant to § 1961, applies thereafter.

## III. CONCLUSION

There is no question that the New Mexico and Utah Names suffered substantial losses after investing in what had been, for three centuries, a well-regarded institution. There is also no question that Lloyd's was not forthcoming with all the information regarding its substantial financial losses. However, the English courts thoroughly and fairly considered and examined the plight of the Names before entering judgments against them. We must respect the ample process afforded by the English system of justice.

We affirm the New Mexico and Utah district courts' grants of summary judgment to Lloyd's. We reverse and remand with respect to the post-judgment interest as applied to the Harmsens' judgment, with instructions to recalculate the post-judgment interest in accordance with this opinion.